**In re PARIS AIR CRASH OF MARCH 3, 1974.**

**MDL No. 172.**

United States District Court,
C. D. California.

Aug. 1, 1975.

James G. Butler, Los Angeles, Cal., Lee S. Kreindler, New York City, Gerald C. Sterns, San Francisco, Cal., co-lead counsel, Wm. Marshall Morgan, Los Angeles, Cal., liaison counsel, Donald W. Madole, Chairman, Washington, D. C., Daniel C. Cathcart, Los Angeles, Cal., Richard D. Krutch, Seattle, Wash., discovery committee.

F. Lee Bailey, New York City, and Aaron J. Broder by Seymour Madow, New York City, Butler, Jefferson & Fry by James G. Butler, James M. Jefferson, Jr., Robert P. Fry, Michael A. K. Dan, Los Angeles, Cal., Goldfarb & Singer, Washington, D. C., Green, Royce & Seaman by Irving H. Green, Hodge & Hodges by John R. Skoog, Los Angeles, Cal., Horgan & Robinson by Mark P. Robinson, Los Angeles, Cal., Kreindler & Kreindler by Lee S. Kreindler, Melvin I. Friedman, Marc S. Moller, New York City, Krutch, Lindell, Donnelly, Dempcy, Lageschulte & Judkins, P. S. by Richard D. Krutch, Vernon T. Judkins, Seattle, Wash., Lewis, Wilson, Cowles, Lewis & Jones, Ltd. by Richard H. Jones, Arlington, Va., McGrail & Nordlund by Joseph V. McGrail, Washington, D. C., Magana & Cathcart by Daniel C.

Cathcart, James J. McCarthy, Los Angeles, Cal., Morgan, Wenzel & McNicholas by Wm. Marshall Morgan, Los Angeles, Cal., David Noble, Los Angeles, Cal., Paul, Weiss, Rifkind, Wharton & Garrison by Joseph S. Iseman, John J. O'Neil, New York City, Ray, Quinney & Nebeker by Marvin J. Bertoch, L. Ridd Larson, Salt Lake City, Utah, Shahin & Wawro by James Wawro, Sherman & Schwartz, Inc. by Arthur Sherman, Beverly Hills, Cal., Speiser & Krause by Stuart M. Speiser, Charles F. Krause, New York City, Speiser, Krause & Madole by Donald W. Madole, Washington, D. C., Walkup, Downing & Sterns by Gerald C. Sterns, Thomas G. Smith, Terence J. O'Reilly, San Francisco, Cal., Walsh & Levine by Laurence W. Levine, New York City, for plaintiffs.

Gibson, Dunn & Crutcher by Robert Forgnone, Los Angeles, Cal., Kirtland & Packard by Robert C. Packard, Jacques E. Soiret, Los Angeles, Cal., Mendes & Mount by James M. FitzSimons, Joseph J. Asselta, New York City, Tuttle & Taylor by William A. Norris, Joseph R. Austin, Marilyn T. Clare, Andrew Schepard, Charles Rosenberger, Los Angeles, Cal., for McDonnell Douglas Corp.

Overton, Lyman & Prince by Fred S. Lack, Jr., Ernest E. Johnson, Brenton F. Goodrich, Gregory A. Long, Los Angeles, Cal., for General Dynamics Corp.

Chase, Rotchford, Drukker & Bogust, Los Angeles, Cal., for Brackett, Inc., and Fireman's Fund Ins. Co.

Adams, DuQue & Hazeltine by Thomas F. Call, Los Angeles, Cal., Con-don & Forsyth by George N. Tompkins, Jr., Desmond T. Barry, Jr., Frank A. Silane, New York City, Latham & Watkins by Philip F. Belleville, A. Vic-Los Angeles, Cal., McKenna & Fitting by Daniel N. Belin, Los Angeles, Cal., Milbank, Tweed, Hadley & McCloy by Edward J. Reilly, Russell E. Brooks, New York City, Shaw, Pittman, Potts & Trowbridge by Phillip D. Bostwick, Jay H. Bernstein, Washington, D. C., for Turkish Airlines, Inc.

William D. Keller, U. S. Atty., Los Angeles, Cal., James R. Dooley, Asst. U. S. Atty., Los Angeles, Cal., John Laughlin, Herbert L. Lyons, Sp. Attys., Torts Section, Aviation Div., Dept. of Justice, Neil Eisner, Federal Aviation Administration, Washington, D. C., for the United States.

## MEMORANDUM OF OPINION IN RE CHOICE OF LAW ON DAMAGES

PEIRSON M. HALL, Senior District Judge.

Before getting to the points involved in the several motions, a general statement concerning this Aegaéonic[1] case is in order.

On March 3, 1974, shortly after take-off from Paris, France, a Douglas DC-10 passenger airplane owned and operated by Turkish Air Lines[2] crashed in France, destroying the plane and killing all human occupants (346) aboard, 13 of whom were crew.[3] The number of dependents and claims are

1. Aegaéon: The leader of three brothers of mythology, each with 100 arms and 50 heads.

2. The official name is Turk Hava Yallari, A.O., hereinafter referred to as THY.

3. The released figure is 346 persons; but shortly after the suits were filed, McDonnell Douglas secured a peremptory writ from the Court of Appeals for the Ninth Circuit prohibiting this Court and the parties from securing any information about either the passengers or claimants. The writ, which was argued on its merits in April, 1974, was not decided until May 23, 1975, three months after the statute of limitations in California

had expired on March 3, 1975, an undoubted oversight. The Court also reversed this Court's holding that one of the cases was a class action on behalf of claimants not represented by individual counsel. If suits are filed in other states within the two-, three-, and six-year statutes of limitations on death cases after this case is finished here, the burden on defendants in producing their top executives for prolonged depositions at distant places will not have been eliminated, as it would with a class action. That was one of the principal factors in conceiving and passing the Multidistrict Litigation Act and in enlarging the previous class-action rule.

unknown, but unofficial estimates have placed that number at about 1,000.

There are 203 suits involving 337 decedents arising from that crash pending in this court. One hundred ninety-one were initially filed here and transferred to the undersigned judge under our local "low-number" rule. Ten were transferred here from other districts under 28 U.S.C. § 1407 by the Judicial Panel on Multidistrict Litigation and given MDL Docket No. 172. Each of the 203 suits have cross-claims, third-party complaints, or counterclaims, some amended as many as three or four times. All the cross-claims have numerous special defenses, one as many as 20. All of the local and transferred cases were assigned MDL Docket No. 172, and the undersigned judge was designated by the MDL Panel under 28 U.S.C. § 1407.

THY filed one suit in this court (CV–74–1526–PH) for $35,000,000+ for hull damage and loss of use and for contribution or indemnity. It was transferred to the undersigned judge for all purposes under our local rules and is consolidated with MDL 172. Among its causes of action, THY has one for strict product liability against McDonnell Douglas and General Dynamics. McDonnell Douglas has cross-claimed in that case for contribution and indemnity against THY, exculpating itself and claiming that the sole cause of the crash was THY, as has General Dynamics, which cross-claimed against McDonnell Douglas and THY and counterclaimed against McDonnell Douglas's third-party complaint against General Dynamics.

That case and all the other cases have been separated on the issue of liability from damages and consolidated with the lead cases and with each other for discovery and related matters.

A deposition discovery schedule on liability and an exhibit depository were set up shortly after the cases were filed. The schedule required that beginning in July, 1974, the parties would spend two weeks on and one week off on depositions, which schedule they have quite rigidly held even though the lawyers on the Plaintiffs' Discovery Committee and defense counsel come from New York, Washington, D.C., State of Washington, and other distant places. Even so, the Court's latest information is that only 12 witnesses were completed by the end of May.[4] Discovery on damages commenced in each case upon filing and has proceeded apace with all the tools of discovery except depositions.

Several motions, each important enough to require one full week of argument, have been made. Some have been acted upon, and some have not. Some of the plaintiffs made a motion for a partial summary judgment on liability, which, after full argument and briefs, was denied from the bench. The Court has written no memorandum upon that decision delineating its reasons because it felt that the less said by the Court on that subject, the better. The plaintiffs have a right to renew the motion, and neither side should be prejudiced by a determination of what facts are or are not material or what facts to support a judgment exist without genuine issue.

All of the motions have been copiously documented and excellently briefed and argued. But the questions are so numer-

The class action by plaintiffs in crash cases is as much for the benefit of defendants as it is for the members of the plaintiffs' class. Witness here, with 346 decedents, 322 have individual lawyers representing the claimants arising from their deaths. Class actions in crash cases discourage "ambulance chasing." With class action as found, the Court can control, and has controlled, that activity.

4. This suggests that some speedier system must be devised. The deposition of the president of McDonnell Douglas takes 1,500 pages, which required a special order to give him time to read it before signing. This should convince the defendants, as well as other critics, of the necessity of giving all claimants a notice so they can be before one court or be joined in a class action if they desire to sue, in order to avoid repetition of the time taken of important businessmen in repeated cases, in different circuits, or possibly different countries, inasmuch as DC–10's, and other jets, are sold throughout the world.

ous that, it seems, before one set of arguments and briefs can be read and thought through, another critical matter requiring the Court's immediate attention has arisen. The matters submitted and not yet decided concern the constitutionality and application of the Warsaw Convention of 1929, the Hague Protocol, and the Montreal Agreement; the value of gold French francs of 1929 to be considered as against the official value of the gold French franc today, if the Warsaw Convention applies; separate trial of issues and parties; applicability of the California Consumer Credit Act; a motion for summary judgment by defendants against the plaintiffs' claim for punitive damages; and choice of law on liability and damages.

Opinions were in various stages of preparation on all of said subjects until May 27 and 29, 1975, when McDonnell Douglas, General Dynamics, and THY announced in open court that they had informally just agreed to a formula among themselves for sharing all damages so that the matter of liability need not be litigated, but that all claims could be disposed of by settlement, or trial, on the issue of damages. Certain conditions were attached, and the matter was continued so that the agreements could be formalized. But more of that later.

As to the Warsaw Convention and its corollary questions, the Court deferred decision because the Supreme Court has repeatedly said that a constitutional question should not be decided until it is necessary; and it may not be necessary in this case to decide the constitutionality or validity or application of the Warsaw Convention, the Hague Protocol, or the Montreal Agreement, or of any one of them. At least it is not necessary at this time, for reasons which would be inappropriate to mention here and now.

Motions were heard and submitted on the right to punitive damages, decision on which also is not necessary at this time.

The United States filed a motion to dismiss all of the plaintiffs' complaints on the ground that the accident occurred in France and that, under 28 U.S.C. § 2680(k), it could not be sued under those terms of the Tort Claims Act which provide:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

(k) Any claim arising in a foreign country."

All of the acts or failures to act of the United States upon which plaintiffs rely are alleged in the complaints to have occurred in the United States, in the State of California, by the wrongful approval, certification, inspection, and the like, of the plane, or the failure to do so, by the United States, and by its failure to require changes in the structure of portions of the plane and follow-through before and after delivery of it, even though those acts or failures came to fruition in another state or in a foreign country. *Roberts v. United States,* 498 F.2d 520, 522, fn.2 (9th Cir. 1974): "Under the FTCA, a tort claim arises at the place where the negligent act or omission occurred and not where the negligence had its 'operative effect,' (i.e., the situs of injury). *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed. 2d 492 (1962)"; *Aanestad v. Beech Aircraft Corp.,* 521 F.2d 1298 (9th Cir. 1974, June 20, 1974); *L. D. Reeder Contractors v. Higgins Industries,* 265 F.2d 768, 773–74, fn. 12 (9th Cir. 1959), quoting 47 Geo.L.J. 342, 351–52 (1958). Thus, *none* of the claims against the United States for death, as alleged in the complaints, is a "claim *arising* in a foreign country." All of the conduct, whether "act or omission," on the other hand, occurred as the result of acts allegedly arising, i.e., occurring, in California, and, under 28 U.S.C. § 1346(b), resulted in "claims against the United States, for money damages, accruing . . . for . . . death caused by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the *law of the place* where the act or omission occurred." [emphasis added.] Hence, under the allegations of the complaints, the law of California, including its "choice-of-law" rule, was, and is, applicable to the United States.

Counsel for the United States requested a certification for a "quick" appeal under 28 U.S.C. § 1292(b), which was forthwith denied. On May 9, 1975, the United States applied to the United States Court of Appeals for a Writ of Mandamus, which was denied without opinion on May 23, 1975.

As previously mentioned, on May 27 and 29, 1975, defendants in open court made an offer to negotiate settlements with the claimants of each of the 337 decedents or to try *damages only*. The offer was made on the condition that if plaintiffs abandon any claim for punitive or exemplary damages, "[l]iability will not be contested [by defendants], if a case cannot be settled, . . . any place, any time, anywhere by anybody at any time, for any reason whatsoever." [5] Some of those asking punitive damages objected, but inasmuch as the defendants had only come to agreement the night before, the Court stayed all discovery and all further proceedings pending the resolution of questions raised by counsel for plaintiffs and the finalization of details of an agreement between defendants for the proposal to settle, and continued the matter to June 16, 1975, for further report and consideration, and again continued it to July 8, 1975.

At that time, i.e., July 8, 1975, counsel for defendants McDonnell Douglas, General Dynamics, and THY announced they had come to complete agreement among themselves as to sharing the damages of all the plaintiffs and had formalized it

in writing, but that such agreement was to be and to remain confidential among them. At the request of the Court, to which all defendants consented and no plaintiffs objected, the defendants submitted the contract to the Court for its perusal *in camera*. This was done on the understanding that the Court would not make it part of the files, *in camera* [5a] or otherwise. There being no objection on the part of the plaintiffs, the Court read the contract *in camera;* and, at the request of the defendants, outlined in open court the "bare bones" of its terms, to the effect that, as to all claims arising from the deaths of the passengers and crew, and as to all property claimants, the defendants would settle, or try damages only, on a compensatory basis, and would secure a release therefor and for all punitive or exemplary damages, good in all courts; but if any plaintiff insisted on punitive or exemplary damages, he would have to go to trial on liability as well as on compensatory and punitive damages. Such trial would, of course, include the United States as a defendant, from whom punitive damages cannot be had. There was no objection of consequence from any of the plaintiffs.

The Court then announced it was preparing an opinion (his opinion) that the applicable law on measure of damages was the California law, as *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), expanded the phrase "pecuniary loss" as used in admiralty. (48 U.S.C. §§ 761–768)

The Court deems it proper that the specific elements of damage not be stated here, but left to be settled at the conference on jury instructions.

One group of Japanese plaintiffs made a demand that said defendants make an admission of fault. The Court explained to one of the Japanese counsel, who was present, that in settlements an admission of fault was not customary or required; that this Court would not require such an admission in the event a

---

5. Transcript, May 27, 1975, page 11.

5a. Since this filing of this opinion, the court ordered the agreement filed *in camera"*

case is compromised; that where an offer of settlement is made, it is unlawful in California to use it as evidence at a trial for any purpose, either fault or damages; and that that is so because in many cases one of the greatest motivations for settlement comes from the desire to avoid a court record of fault. The defendants declined to make such admission or to reconsider or change their proposal.

 The same group of Japanese plaintiffs requested that the Court use the Japanese law for the Japanese claimants because they assert Japanese law is more liberal than California law. They requested a certification for quick appeal, which is hereby denied for the reason that it will not materially advance the ultimate termination of the litigation. On the contrary, it would indefinitely delay it, because final decision from the appellate courts would likely not be forthcoming for two years, during which time the parties would be unsure of what standards should be used in the measure of damages of any claimant, and it would probably halt all settlements and even halt discovery on damages as well as trial on damages.

The Court directed the defendants to create four teams of negotiators to deal simultaneously with the 337 death claims pending in this court, and continued the matter to 10:00 a.m., July 9, 1975, for a report from defendants and for such further matters as might be brought before the court.

On July 9, 1975, the defendants announced they had agreed on three teams instead of four: (1) one team to deal with the 160 cases filed by the Speiser & Madole group of law firms; (2) one team for the 82 cases represented by Walkup, Downing & Sterns and the crew cases; and (3) one team for the 66 cases represented by the Morgan and Kreindler group of law firms and for all other cases not included in the above. No objection was made by any counsel.

The Court thereupon continued all matters to August 25, 1975, at 2:00 p.m.,

for a report on progress of settlement, and stayed discovery on liability until then, indicating that if substantial progress in settlement were made by then, the stay order would be continued, and if substantial progress had not been made by then, the Court would vacate the stay of discovery and order the matter to proceed and get ready for trial on the issue of liability and damages.

Although some counsel have urged the Court to defer to an indefinite date a decision on the question of the law applicable to damages, it seems that advance resolution of that issue is necessary in evaluating the claims for purposes of settlement.

Various arguments have been advanced as to which law should be applied on damages. These include: (1) California, (2) domicile of decedents, (3) domicile of claimants, (4) France, (5) Japan, and (6) California plus French "moral" damages.

We come now to the merits of the questions raised by the motions for determination of the choice of law applicable to damages in this case, with its own unusual set of facts.

The law on "choice of law" in the various states and in the federal courts is a veritable jungle, which, if the law can be found out, leads not to a "rule of action" but a reign of chaos dominated in each case by the judge's "informed guess" as to what some *other* state than the one in which he sits *would* hold *its* law to be. In *Wilbur v. Mullaney*, 496 F.2d 1303 (1st Cir. 1974), the Circuit Court and District Court agreed on the interpretation of state law, but the State Court not only disagreed with both of them but also with "the propriety of [their] effort to interpret it." 496 F.2d at 1305. Most of the cases are involved with such a "guess" as to the law of one other state or perhaps as many as three. Here, if the rule laid down in some cases (not California) were followed, this Court would have to "guess" what the courts in 24 foreign and 12 domestic jurisdictions would hold on the facts in this case, including their

"choice-of-law" rules, and who knows what laws of what country or state that would lead to.

Nevertheless, it is my task to discover, if possible, the way damages should be assessed in this case.

The Court is not unmindful of the June 26, 1975, opinion of the Ninth Circuit in *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, which discussed "the *judicial nightmare* known as Conflicts of Laws." [emphasis supplied.] Suit was for damage to a plane on the grounds of products liability, rather than for wrongful death or personal injuries. The plane was manufactured and sold in Kansas; the plaintiff's residence and the place of the crash were both Washington; and the suit was filed in Oregon.

The District Court held that: The product was defectively designed; under the Oregon conflict-of-laws rule the law of Kansas applied; and Kansas having no product liability law, the action was barred by the Kansas statute of limitations. The Appellate Court reversed the District Court, holding that the Kansas statute of limitations did not bar the action, and directed the District Court to enter appropriate findings on strict liability and, if found, assess the damages. Nothing was said about the choice of law on damages in any of the three separate opinions written by each judge. This suggests the conclusion that the choice of law on liability should also be the choice of law on damages. It is interesting to note in the *Forsyth* case (Oregon) that reference is made to the place of the accident, while California law adopts the place of the *wrong*.

■ The three opinions in *Forsyth* omit discussion on some points which are important in this litigation. There is no mention made of (1) the alternative purpose of strict liability, viz., deterrence; (2) the distinction which should be made between the place of the wrong and that of the accident—if the wrong is in defective design or manufacture, it occurred *at the time and*

*in the place of design and manufacture;* the place where it came to fruition is purely fortuitous; (3) the rights of the manufacturer. In short, the discussions in *Forsyth* assume that the place of the accident governs compensation to all injured within the borders of that state. Under that analysis, the Court would apply French law to determine the damages by the designers and manufacturers in the Paris crash, certainly an undesirable result which could not have been so intended under the California decisions.

In the *Forsyth* case the Court cited with approval a Kansas case which, in turn, cited with approval the following from *Richards v. United States*, 369 U.S. 1, 11–12, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962): "The general conflict-of-laws rule, followed by a vast majority of the States, is to apply the law of the place of the injury to the substantive rights of the parties." *Richards* did not follow that reasoning in holding that Oklahoma, the place of the alleged negligence, applied the law of the place of death (or accident causing the death) under Oklahoma's conflict-of-laws rules, thus leading to the decision that under Oklahoma law, the law of Missouri (the place of the accident) controlled over Oklahoma's more liberal law.

Upon recourse to the *Richards* case, we find the above-quoted statement was an historical recital of conflict-of-law rules. It was immediately followed by the statement (369 U.S. at 12, 82 S.Ct. at 592): "Recently there has been a tendency on the part of some States to depart from the general conflicts rule in order to take into account the *interests of the State* having *significant contact* with the parties to the litigation.[26] We can see no compelling reason to saddle the Act [Tort Claims] with an interpretation that would prevent the federal courts from implementing this policy in choice-of-law rules where the State in which the negligence occurred has adopted it."[6] [emphasis supplied.]

---

**6.** The reference footnote, 26, reads as follows: "*Grant v. McAuliffe*, 41 Cal.2d 859,

264 P.2d 944; *Schmidt v. Driscoll Hotel, Inc.*, 249 Minn. 376, 82 N.W.2d 365; *Haumschild*

Using the reasoning for that decision (*Richards*), California has seen fit to adopt a well-defined policy of "governmental interest" in its choice-of-law rule set forth in several California cases, but best expressed in *Hurtado v. Superior Court,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).

California's choice-of-law rule on damages is not statutory, but has been developed by case law. Under it, in an ordinary case, if diversity of citizenship were the only basis of jurisdiction, this Court would be required to follow the law of the domicile [7] at the time of the crash [*Reich v. Purcell,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967)] of each of the plaintiff litigants in the United States and the domiciles of the thousand or so foreign claimants, which are presently unknown to this Court, although the decedents are reported to have been nationals of 24 countries. In spot-checking some of the cases, it was noted that the "domicile" of some of the *claimants* of the same decedent at the time of the crash was in different states or countries than the decedent or each other, which means, if the California rule were to be applied, the heirs or dependents of one decedent would have as many as two or more states or countries apply their individual and different damage rules to the heirs of the same decedent.

Taking one of the cases at random (No. CV–75–255–PH), the heirs are alleged, at the time of the crash, to be citizens and domiciliaries distributed among four countries, viz., France, United Kingdom, Morocco, and Israel. This is not the only case with such a divergence, which produces an unanswerable enigma. If the law of damages of each country controlled, i.e., if in one country (or state) beneficiaries are limited to linear descendants, in another they may be lateral descendants, and in another they may be dependents regardless of blood affinity, and if one country (or state) limited damages, another imposed a penal fine regardless of damages (Colorado), and another permitted punitive damages, the result would be chaotic, and against the faintest instinct for justice by unequal results to those standing in the same relationship to each other and to the decedent.

The three death cases in California discussing choice of law [*Hurtado v. Superior Court,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974); *Kelley v. Von Kuznick,* 18 Cal.App.3d 805, 96 Cal.Rptr. 184 (1971); *Reich v. Purcell,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967)] each do not discuss which controls, whether the domicile of the claimant or of the decedent; but *Reich* held the domicile of the litigants at the time of the death of the decedent controlled.

So far as the Court can find out from all sources available to it without violating the prohibition of the appellate court, the decedents were from 24 countries, and at least 12 states of the United States were represented among the suits filed—a total of 36 jurisdictions. According to information furnished voluntarily by THY, the human occupants of the plane came from the following countries: Argentina, Australia, Belgium, Brazil, Canada, Cyprus, Denmark, England (United Kingdom), France, India, Northern Ireland (United Kingdom), Republic of Ireland, Italy, Japan, Morocco, New Zealand, North Korea, Paki-

---

*v. Continental Casualty Co.,* 7 Wis.2d 130, 95 N.W.2d 814. See Currie, Survival of Actions: Adjudication versus Automation in the Conflict of Laws, 10 Stan.L.Rev. 205 (1958). Cf. *Vrooman v. Beech Aircraft Corp.,* 183 F.2d 479; *Levy v. Daniels' U-Drive Auto Renting Co.,* 108 Conn. 333, 143 A. 163; *Caldwell v. Gore,* 175 La. 501, 143 So. 387; *Burkett v. Globe Indemnity Co.,* 182 Miss. 423, 181 So. 316."

7. The distinction between "citizenship" and "domicile," or "residence" does not appear to be taken note of in the nine representative and leading California cases. In fact, many lawyers file complaints alleging only diversity of "residence" or "domicile"; and the complaints, unless amended, must be dismissed. But inasmuch as the California cases use "domicile," this Memorandum will use 'domicile," instead of "citizenship," in speaking of California's conflict-of-laws rule.

stan, Senegal, South Viet Nam, Switzerland, Turkey, United States, and West Germany. (Claimants are from all of these countries plus Israel and Sweden.) So far, it presently appears to the Court that claimants are from the states of California, Indiana, Kansas, Maryland, New Jersey, New York, Pennsylvania, South Carolina, Texas, Utah, Virginia, and Washington. How many countries or states are actually involved as to either claimants or decedents neither the Court nor his staff has had time to tabulate, and accurate and complete information has not been supplied to the Court by the parties.

The Court decided from the bench in the early stages of the proceedings, without written opinion, that the law of California and the United States statutes and regulations applicable to these cases would govern the matter of product liability and negligence as well as all other grounds for liability, and that a decision on the choice of law on damages would be deferred to a later date. In view of the agreement among defendants, liability will not be further discussed in this Memorandum.

The complexity of the problem of the choice of law applicable to damages is further illustrated by some facets of the distinctions in the conflicts rules of the 12 states listed above: Five of them use the "significant contacts" (state-with-substantial-ties-to-a-transaction) approach, sometimes interchangeably with "governmental-interest" or "public-interest" approach; six apply the "place-of-the-wrong," i.e., accident, approach; and California specifically uses the "governmental-interest" approach, and such governmental interest exists when the act or omission which ultimately caused the accident occurred in California.

The measure of damages recoverable also varies: One state limits the amount to $50,000; another, to $75,000; four allow full recovery with varying limitations; one has full recovery plus pain and suffering and mental anguish; and

five use "compensatory" and, in some instances, "pecuniary."

No standard or rules for choice of law on damages (where there may be a conflict) of any of the foreign nations involved has been cited to the Court by the parties, and none has been found on independent research, although the parties have set forth the elements of the measure of damages in death cases in some, but by no means all, of the countries involved.

■ The objective of the governmental-interest approach is "to determine the law that most appropriately applies to the issue involved." *Reich v. Purcell, supra,* at 554, 63 Cal.Rptr. at 34, 432 P. 2d at 730. The search must consider the interests of the litigants and involved states. One case illustrating such a search includes a situation involving a state of the United States vis-a-vis a political entity of a foreign country. *Kasel v. Remington Arms Co.,* 24 Cal.App.3d 711, 101 Cal.Rptr. 314 (1972).

The *Kasel* Court indicated [p. 731, 101 Cal.Rptr. p. 327] that "[t]he forum has a definite interest in applying its own law," and it " 'will be displaced only if there is a compelling reason for doing so.' It is 'applicable unless either the plaintiff or the defendant has been forced into a forum devoid of any such contact as would justify application of its own law.' Ehrenzweig, Conflict of Laws (1962) § 213, p. 555."

"[W]hen the defendant is a resident of California and the *tortious conduct giving rise* to the wrongful death action occurs here, California's deterrent policy of full compensation is clearly advanced by application of its own law." *Hurtado, supra,* 11 Cal.3d at 584, 114 Cal.Rptr. at 112, 522 P.2d at 572. [Emphasis supplied.]

*Hurtado* indicates that limitation on damages by a state modifies the previous California rule, considering only the plaintiff's best interest, by a countervailing, or "balancing," concern to protect local defendants against exces-

sive financial burdens for the acts involved. It says:

"It is important, therefore to recognize the three distinct aspects of a cause of action for wrongful death: (1) compensation for survivors, (2) deterrence of conduct and (3) limitation, or lack thereof, upon the damages recoverable. *Reich v. Purcell* recognizes that all three aspects are primarily local in character. The first aspect, insofar as *plaintiffs* are concerned, reflects the state's interest in providing for compensation and in determining the distribution of the proceeds, said interest extending only to local decedents and local beneficiaries (see fn. 4, *ante*); the second, insofar as *defendants* are concerned, reflects the state's interest in deterring conduct, said interest extending to all persons present within its borders; the third, insofar as *defendants* are concerned, reflects the state's interest in protecting resident defendants from excessive financial burdens. In making a choice of law, these three aspects of wrongful death must be carefully separated. The key step in this process is delineating the issue to be decided." 11 Cal.3d at 584, 114 Cal.Rptr. at 112, 522 P.2d at 572.

In the instant case, all three issues compel application of the California law of damages.

Footnote 4 referred to above in *Hurtado* has this quotation from *Reich v. Purcell, supra,* at 556, 63 Cal.Rptr. at 35, 432 P.2d at 431:

"Wrongful death statutes create causes of action in specified beneficiaries and distribute the proceeds to those beneficiaries. The proceeds in the hands of the beneficiaries are not distributed through the decedent's estate and, therefore, are not subject to the claims of the decedent's creditors and consequently do not provide a fund for local creditors. Accordingly, the interest of a state in a wrongful death action insofar as plaintiffs are concerned is in determining the distribution of proceeds to the beneficiaries and that interest extends only to local decedents and beneficiaries."

Applying this to our case, California has no interest in the distribution of proceeds to foreign beneficiaries, but is interested mainly in (1) deterring conduct of its defendants, (2) avoiding the imposition of excessive financial burdens of its resident defendants, and, I now add, (3) providing a uniform rule of liability and damages so that those who come under the ambit of California's strict product liability law and market their product outside of California and/or in foreign countries may know what risks they are subject to when they make and sell their products. Under the holdings of *Reich* and *Hurtado,* California courts would not apply foreign standards which limit recovery, and would hold that the foreign jurisdiction has no interest in so holding because the latter has no California resident defendant to protect.

When a foreign jurisdiction would allow *greater* recovery than California, a more liberal standard should NOT be adopted. *Gordon v. Eastern Air Lines,* 391 F.Supp. 31 (S.D.N.Y.1975). The case arose in the Florida Everglades crash case. After the defendant eliminated liability in Florida in the multi-district litigation proceedings, the case was returned for damage trial to New York, which was plaintiff's residence and the place where the case was originally brought. The case analyzed various jurisdictions to see which had the strongest interest in the outcome, much the same as what California terms the "governmental-interest" approach, and applied New York's measure of damages instead of the Florida law, which permits higher measures of damages. Since conduct was not involved, the place of defendant's business (Florida) was insignificant, and the fact that it was also the crash site was fortuitous. It was argued that Florida also had an interest in promoting tourism, which might be furthered by inducing carriers to ex-

ercise greater care through awards of greater damages. This was answered by saying that due care was not in issue since liability was eliminated and that Florida has no interest in how much a New York jury gives a New York resident in a New York court. The Court found New York public policy to be to protect its own residents against unfair foreign laws, but not to enhance recovery by application of more liberal foreign rules. To allow this would induce forum shopping.

Applying the same principles, the California courts would protect resident defendants and would not allow enhanced recovery to plaintiffs because of the fortuitous place of the crash or residence of the litigants. *A fortiori* California would not allow nonresidents a greater recovery than the law of this forum allows its own resident plaintiffs.

The Third Circuit recently refused to apply its own law because of lack of activity in the state by the defendant. Since it involved strict product liability and used the "governmental-interest" approach, the holding and language are of interest: A state having a liberal products liability law has as its primary purpose the compensation of plaintiffs for injuries. An alternate purpose is to exact compensation from the tortfeasor in order to deter future misconduct, citing *Hurtado*. Since in the Third Circuit case the tortious conduct was wholly outside the state (Pennsylvania), that policy of deterrence would not be effective and, hence, not fostered. *Henry v. Richardson-Merrill, Inc.*, 508 F.2d 28 (3rd Cir. 1975). By analogy, since the tortious conduct in this Paris case was within the State of California, the deterrent policy *would* be fostered by applying local law.

The *Henry* case, at page 34, quotes from Comment, False Conflicts, 55 Cal.L.R. 74, 80–81:

"Laws of a state . . . are not designed to dispose of all conceivable cases, but only of those having factual contact with the state such that it may be affected by the outcome of the suit. *A state is so affected when one of the persons it presumes to protect is a party to the dispute, when misconduct it finds culpable transpired within the state, when its courts are invoked to resolve a dispute it wishes to avoid, or when persons with a financial stake in the litigation are residents of the state.*" [Emphasis supplied]

There is no question that three of the four defendants have actual contacts with California, and they will be affected by the outcome of this MDL litigation. The acts and omissions alleged occurred here, and plaintiffs have chosen to bring their suits in this forum. It is, therefore, fitting that the latter be bound by a measure of damages designed to deter misconduct, yet to protect resident defendants against excessive claims.

Counsel for some Japanese claimants, as do counsel for a large block of other claimants, argue that inasmuch as both Japan and France have a broader base for calculating damages, which should result in higher verdicts, the Court should apply Japanese law to the Japanese claimants and French law to all others, including Americans. If that argument were adopted, then it seems to the Court that it would violate the defendants' rights in that it would deny to the defendants the equal protection of the laws guaranteed by the Fourteenth Amendment to the U. S. Constitution. *Kasel, supra,* 24 Cal.App.3d at 741, 101 Cal.Rptr. 314, specifically refuses to adopt a rule that the law most favorable to a plaintiff, whether he be a resident or a nonresident, a citizen or an alien, be applied. Moreover, the Japanese and other foreign plaintiffs voluntarily filed here, and "[h]e who takes the benefit must bear the burden" (Cal.C.C. § 3521) is as much a part of the California law as its judge-created conflict-of-laws rule.

■ It has been argued that the California policy of deterrence will not be impaired by applying foreign law, but that begs the question. Generally a forum applies its own law, and it is

incumbent on a litigant who wishes to apply the law of a foreign state to demonstrate that the latter rule of decision "will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Hurtado, supra,* at 581, 114 Cal.Rptr. at 110. That has not been shown here.

Early in these proceedings defendants urged the application of English law of damages (considerably lower than California's) because plaintiffs should not be entitled to recover more than they could recover under the law of their residence. The same argument was rejected in *Hurtado,* at page 586, 114 Cal. Rptr. at page 114, saying:

> "Limitations of damages express no such state interest. A policy of limiting recovery in wrongful death actions 'does not reflect a preference that widows and orphans should be denied full recovery.'"

█ As for those countries or states where recovery would be less than by applying California law, surely they have no interest in limiting recovery of their resident plaintiffs as against a nonresident of their country or state which is a defendant here. Surely the interest of those states would be satisfied so long as there is *full* recovery for "such damages as may be just," as California allows. Where there is no showing that a foreign interest is greater, or where the interests are equal, California will apply its own law. *See Bernhard v. Harrah's Club,* 42 Cal. App.3d 1024, 1032, 117 Cal.Rptr. 351 (1974).

The Court in this case must consider more than the *California* governmental interest. It must include the *United States interest* in this multi-nation situation, as was recently pointed out in *Challoner v. Day and Zimmerman,\* Inc.,* 512 F.2d 77, 82 (5th Cir. 1975).

*Challoner* was a suit filed in Texas for the death of a *Tennessee* resident and serious injury of a *Wisconsinite* caused by premature explosion in *Cambodia* of a howitzer round *manufactured* in *Texas.* The Court held the manufacturer strictly liable and *applied Texas law,* relying on the principles of *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) [incorrectly cited as "Greenbaum"]. Texas conflict of law applies *lex loci* rules, which the Court refused to follow. Possibly most important to us is one of the reasons for not applying Cambodian law, which is certainly an excellent reason for not applying domiciliary law of foreign nations and states in the Paris cases:

> "A third and final reason for not applying Cambodian law lies in the very nature of this Court. We are a Court of the United States, an instrumentality created to effectuate the laws and policies of the United States. We conclude that in this case we have no warrant, legal or moral, to frustrate well established American policies by an application of the local policies of a foreign government." 512 F.2d at 82.

It would be as improper to apply forum law merely *because* it allows a higher return as it would be improper to apply foreign law merely *because* it allows a lower return; and the converse is true.

█ Mention has been made of the argument that applying California law on damages would put the California designers and manufacturers at a competitive disadvantage, although it is not clear just how or why this would result from applying the California law on damages. On the contrary, the state of residence of designers and manufacturers has a most significant interest in applying its measure of damages to a product distributed throughout the world for the sake of uniformity of decisions involving such designers and manufacturers, to give only one reason.

---

\* See *Day and Zimmerman, Inc.,* 96 S.Ct. 167, which vacated *Challoner* after the date of this opinion.

■ Moreover, it must not be forgotten, inasmuch as the United States has preempted the field of regulating aviation [*City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973)] to the extent that *no plane manufactured anywhere in the United States can fly without a United States certificate of airworthiness,* that the United States Government has as much, or greater, interest in the products which it certifies as airworthy as any state or any nation in order to insure the integrity of its products in this very competitive world market and also to insure that anyone coming within the ambit of strict products liability shall know that its liability for a defect shall be uniform, no matter where or how the defect is discovered, through accident or otherwise.

As a corollary to the aforementioned integrity of the product put in commerce, the United States has a great concern with its designers and manufacturers of such product. Anyone injured throughout the world should be assured that he can obtain recourse under the law of the state of design and/or manufacture. There is no indication that the designers or manufacturers would be amenable to process or otherwise liable to suit in any other nation of the world. On June 17, 1974, in arguing a motion to dismiss on the ground of *forum non conveniens,* counsel for McDonnell Douglas suggested that if the Court granted its motion in connection with a suit brought on behalf of an English decedent, McDonnell Douglas would agree to a condition that it consent to jurisdiction in England, without assurance that England would accept this attempt to confer jurisdiction. McDonnell Douglas refused to agree that it was or would be amenable to suit in every foreign country and state of the United States potentially involved. Clearly it is not compatible with American principles of justice and fairness that liability and damages should be determined in accordance with the whim or volition of a defendant designer or manufacturer.

Title 14, Code of Federal Regulations, Part 25,[8] which deals with *"Airworthiness Standards: Transport Category Airplanes,"* alone has 365 sections dealing in hundreds of explicit details (among others, "Pressurized Cabin Loads") concerning the requirements in the construction of an airplane before it can be certified as "airworthy." The FAA recently issued an Air Directive to change the design of all wide-bodied jets in the interests of safety. Thus, it is clear that the United States interest in and control over the design, manufacture, and maintenance of all aircraft designed and manufactured in the United States are continuing concerns.

The Court can take judicial notice[9] that: The DC-10 plane was designed, constructed, manufactured, and tested in California; it is known throughout the world; it is in direct domestic, foreign, and international competition with wide-bodied jets manufactured abroad as well as with other American-made jets; McDonnell Douglas advertises that the DC-10 is sold to and used by 34 carriers, 25 of which are foreign; according to FAA statistics, there were 110 DC-10's in service throughout the world on March 4, 1974; the airlines using the DC-10 fly into 83 countries or protectorates; 113 foreign cities are serviced by regularly scheduled flights of the DC-10. The number of million or billion passenger miles flown annually by the DC-10's domestically and internationally is not available, but every mile is a danger to the passenger *if* he

8. Attached as Appendix A is a copy of the table of contents of Part 25, illustrating the all-encompassing range of United States control of design and manufacture of planes.

9. Federal Evidence Code § 201; *Brown et al. v. Piper,* 91 U.S. (1 Otto) 42, 43, 23 L.Ed.

200 (1895); *Nev-Cal Electric Securities Co. v. Imperial Irrigation District,* 85 F.2d 886 (9th Cir. 1936); *Greeson v. Imperial Irrigation District,* 59 F.2d 529 (9th Cir. 1932).

is flying in a plane whose design and construction cannot withstand the decompression explosion caused by a sudden opening into its pressurized baggage compartment. "For every wrong there is a remedy." (Cal.C.C. § 3523.)

■ Clearly the United States and the State of California both have governmental interests in applying the law of California, a state of the United States, in the measure of damages for each claimant, which interests are significantly greater than the interest of the countries or states of which either the decedents or claimants are citizens.

The United States having no general statute promulgating the measure of damages in a death case, the Court, under the Rules of Decision Act (28 U.S.C. § 1652), must, and will, apply the California measure of damages, which is "such damages . . . as . . . may be just."[10]

In addition to the above, the elements of the measure of damages of the states of the United States whose citizens have sued here are not of enough difference to apply any other law than California's. In doing so, in view of the federal interest, this Court will adopt the liberalization over California's interpretations of the phrase "pecuniary loss" as laid down by the Supreme Court in *Sea-Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

■ On the face of their texts, neither Warsaw nor Hague, nor Montreal, apply to the United States or to McDonnell Douglas or General Dynamics.[11]

■ *Challoner, supra*, refused to follow the forum's choice of law, as dictated by *Klaxon v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Instead, the Court held that there is a *federal* choice of law which must be followed. That holding is a natural outgrowth of the *Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400 (7th Cir. 1974), *cert. denied sub nom. Forth Corp. v. Allegheny Airlines, Inc.*, 421 U. S. 978, 95 S.Ct. 1979, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975), ruling that federal law should be used to determine the rights and liabilities of parties where there is a dominant federal interest. In *Kohr*, at page 403, the Court said:

"The basis for imposing a federal law of contribution and indemnity is what we perceive to be the predominant, indeed almost exclusive, interest of the federal government in regulating the affairs of the nation's airways. Moreover, the imposition of a federal rule of contribution and indemnity serves a second purpose of eliminating inconsistency of result in similar collision occurrences as well as within the same occurrence due to the application of differing state laws on contribution and indemnity. Given the prevailing federal interest in uniform air law regulation, we deem it desirable that a federal rule of contribution and indemnity be applied."

The interest of the federal government in regulating the design and manufacture of aircraft is just as intensive, pervasive, exclusive and great as its interest in regulating the "affairs of the nation's airways." [*See,* Appendix A.] The preemption by the federal government of the entire field of aviation is illustrated in *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), and in *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283 (1944).

■ This Court has previously held that the Federal Aviation Act of 1958 does create a private cause of action under both the federal question and regulation of commerce clauses.[12]

---

10. Cal.C.C.P. § 377.

11. The Court specifically does not in this Memorandum intend to pass on the constitutionality or other possible legal defects of any one of the three mentioned.

12. *Gabel v. Hughes Air Corp.*, 350 F.Supp. 612 (C.D.Cal.1972).

Recently the Supreme Court set forth the factors which are relevant in determining whether a private remedy is implicit in a statute not expressly providing one. *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, decided June 17, 1975, sets them forth on page 78, 95 S.Ct. on page 2087 of the opinion:

First, is the plaintiff "one of the class for whose especial benefit the statute was enacted . . . ?" It is obvious from the discussion in the *Gabel* case that the overwhelming interest of the legislation is in safety. If the safety is not that of the passengers, then the Act has no meaning at all; and the first place to begin on safety is in the design and manufacture of aircraft.

■ Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? The legislative history shows the purpose of creating the Federal Aviation Administration was to avoid the division of responsibility which had arisen under previous legislation, to unify agencies for "Air-Safety Legislation," and to give the new administrator power to, among other things, "[m]*ake and enforce safety regulations governing the design and operation of civil aircraft.*" (italics added) Pub.L. 85–726, 1958 U.S.Code Cong. & Admin.News, p. 3741 *et seq.*

■ Third, is it consistent with the underlying purposes of the legislative scheme to employ such a remedy for the plaintiff? This can also be answered affirmatively under the same discussion as for the previous question. As a general rule, when legislation provides a particular remedy or remedies, courts should not expand coverage to subsume other remedies, but even the most basic principles of statutory construction must yield to clear contrary evidence of legislative intent. *Passenger Corp. v. Passengers Assn.,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). Clear intent on the part of Congress to provide against the improper design and manufacture of aircraft is found in the Federal Aviation Act, 49 U.S.C. § 1506, which says, *inter alia:* "[T]he provisions of this chapter are in addition to such remedies" of the states. Where conduct was tortious, it was held that a private remedy would lie for persons on whose behalf a regulation was made. *Fitzgerald v. Pan American Air Lines,* 229 F.2d 499 (2d Cir. 1956); *Errion v. Connell,* 236 F.2d 447 (9th Cir. 1956). *See also, Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed 60 (1803); *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed 939 (1945); *Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); and other cases cited and discussed in *Gabel v. Hughes Air Corp.,* 350 F.Supp. 612 (C.D.Cal.1972).

Finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law? The converse, of course, is true since the federal regulation of aviation is so pervasive as to preempt state attempts at any such regulation. *City of Burbank v. Lockheed Air Terminal, Inc., supra.*

■ It is plain that there is a clearly articulated federal right in these plaintiffs to enforce rights arising from their decedents' deaths when flying in planes which allegedly are unsafe. The Constitution provides in Articles 3, Section 2: "The judicial Power shall extend to all Cases, in Law and Equity, *arising* under this Constitution, *the Laws of the United States,* and Treaties made, or which shall be made, under their Authority; . . . *between* . . . the *Citizens* [of a State] and *foreign* States, *Citizens* or *Subjects.*" [emphasis supplied.] Title 28 of the United States Code, Section 1332(a)(2), pro-

vides for diversity jurisdiction in amounts exceeding $10,000 where the action is between *"citizens of a State and foreign states or citizens or subjects thereof."* [emphasis supplied.] There is also a long line of cases beginning with *The Sapphire,* 78 U.S. (11 Wall) 164, 20 L.Ed. 127 (1870). The Court stated, in that case, on that proposition, the following:

"The first question raised is as to the right of the French Emperor to sue in our courts. On this point not the slightest difficulty exists. A foreign sovereign, *as well as any other foreign person, who has a demand of a civil nature against any person here, may prosecute it in our courts.* To deny him this privilege would manifest a want of comity and friendly feeling. Such a suit was sustained in behalf of the King of Spain in the third circuit by Justice Washington and Judge Peters in 1810. The Constitution expressly extends the judicial power to controversies between a State, or *citizens thereof,* and *foreign States, citizens,* or *subjects, without reference to the subject-matter of the controversy."* [emphasis supplied.]

As previously noted, the Court has ordered all cases in this multidistrict litigation consolidated with the lead cases, Nos. CV–74–698–PH and CV–74–808–PH, and with each other, and severed as to liability and damages. Included in these are several cases from other districts, of which some mention must be made, in particular, those from other states.

A transferee court is required to follow the laws of the transferor state in various matters. *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L. Ed.2d 945 (1964), makes this explicit in a transfer under 28 U.S.C. § 1404(a); and the same principles apply to transfers under 28 U.S.C. § 1407.

At the Court's request, counsel for each of the cases transferred from other states have submitted briefs concerning the choice of laws in the respective states concerning liability and damages. It is clear that there is no substantial difference in any of them from the laws of this forum. Kansas has a $50,000 limitation of liability, but the interest of California and the Federal Government override the interest of Kansas; and California law will apply over Kansas law as well as over the law in the cases from all other states.

By California C.C.P. § 377 and California case law under it, there can only be a single gross sum awarded for the death of any decedent [*Watkins v. Nutting,* 17 Cal.2d 490, 498, 110 P.2d 384 (1941)]; and allocation, distribution, and apportionment of that single sum is to be made by the judge by the command in Cal.C.C.P. § 377 that "[t]he respective rights of the heirs and dependent parents in any award shall be determined by the court," in a separate proceeding (*Watkins, supra,* at 498, 110 P.2d 384). This memorandum deals with the elements of the "single sum" of damages for the death of a decedent, and distribution of that sum will have to be dealt with on a case-by-case basis as it arises.

The Court, in conclusion, for the reasons hereinbefore stated, holds that the "governmental interest" of both California and the United States, or either of them, outweighs any and all other interest of any State or Nation in determining the measure of damages in these cases; that California law applies because of California's "governmental interest"; and that the California law governs damages under the Rules of Decision Act, 28 U.S.C. § 1652, because of the overriding interest of the United States in the design and manufacture of aircraft.

# APPENDIX A

## Title 14—Aeronautics and Space

**PART 25—AIRWORTHINESS STAND-ARDS: TRANSPORT CATEGORY AIR-PLANES**

### Subpart A—General
Sec.
25.1 Applicability.
25.2 Special retroactive requirements.

### Subpart B—Flight
#### GENERAL
25.21 Proof of compliance.
25.23 Load distribution limits.
25.25 Weight limits.
25.27 Center of gravity limits.
25.29 Empty weight and corresponding center of gravity.
25.31 Removable ballast.
25.33 Propeller speed and pitch limits.

#### PERFORMANCE: RECIPROCATING ENGINE POWERED AIRPLANES
25.45 General.
25.47 Wing flap position.
25.49 Stalling speeds.
25.51 Takeoff.
25.55 Takeoff speeds.
25.57 Accelerate-stop distance.
25.59 Takeoff path.
25.61 Temperature accountability.
25.65 Climb: all engines operating.
25.67 Climb: one engine inoperative.
25.69 Climb: two engines inoperative.
25.75 Landing.

#### PERFORMANCE: TURBINE ENGINE POWERED AIRPLANES
25.101 General.
25.103 Stalling speed.
25.105 Takeoff.
25.107 Takeoff speeds.
25.109 Accelerate-stop distance.
25.111 Takeoff path.
25.113 Takeoff distance and takeoff run.
25.115 Takeoff flight path.
25.117 Climb: general.
25.119 Landing climb: All-engine-operating.
25.121 Climb: One-engine-inoperative.
25.123 En route flight paths.
25.125 Landing.

#### CONTROLLABILITY AND MANEUVERABILITY
25.143 General.
25.145 Longitudinal control.
25.147 Directional and lateral control.
25.149 Minimum control speed.

#### TRIM
25.161 Trim.

#### STABILITY
25.171 General.
25.173 Static longitudinal stability.
25.175 Demonstration of static longitudinal stability.

Sec.
25.177 Static directional and lateral stability.
25.181 Dynamic longitudinal, directional, and lateral stability.

#### STALLS
25.201 Stall demonstration.
25.203 Stall characteristics.
25.205 Stalls: Critical engine inoperative.
25.207 Stall warning.

#### GROUND AND WATER HANDLING CHARACTERISTICS
25.231 Longitudinal stability and control.
25.233 Directional stability and control.
25.235 Taxiing condition.
25.237 Wind velocities.
25.239 Spray characteristics, control, and stability on water.

#### MISCELLANEOUS FLIGHT REQUIREMENTS
25.251 Vibration and buffeting.
25.253 High-speed characteristics.

### Subpart C—Structure
#### GENERAL
25.301 Loads.
25.303 Factor of safety.
25.305 Strength and deformation.
25.307 Proof of structure.

#### FLIGHT LOADS
25.321 General.

#### FLIGHT MANEUVER AND GUST CONDITIONS
25.331 General.
25.333 Flight envelope.
25.335 Design airspeeds.
25.337 Limit maneuvering load factors.
25.341 Gust loads.
25.343 Design fuel and oil loads.
25.345 High lift devices.
25.349 Rolling conditions.
25.351 Yawing conditions.

#### SUPPLEMENTARY CONDITIONS
25.361 Engine torque.
25.363 Side load on engine mount.
25.365 Pressurized cabin loads.
25.367 Unsymmetrical loads due to engine failure.
25.371 Gyroscopic loads.
25.373 Speed control devices.

#### CONTROL SURFACE AND SYSTEM LOADS
25.391 Control surface loads: general.
25.393 Loads parallel to hinge line.
25.395 Control system.
25.397 Control system loads.
25.399 Dual control system.
25.405 Secondary control system.
25.407 Trim tab effects.
25.409 Tabs.
25.415 Ground gust conditions.
25.427 Unsymmetrical loads.
25.445 Outboard fins.
25.457 Wing flaps.
25.459 Special devices.

GROUND LOADS

Sec.
25.471 General.
25.473 Ground load conditions and assumptions.
25.477 Landing gear arrangement.
25.479 Level landing conditions.
25.481 Tail-down landing conditions.
25.483 One-wheel landing conditions.
25.485 Side load conditions.
25.487 Rebound landing condition.
25.489 Ground handling conditions.
25.491 Takeoff run.
25.493 Braked roll conditions.
25.495 Turning.
25.497 Tail-wheel yawing.
25.499 Nose-wheel yaw.
25.503 Pivoting.
25.507 Reversed braking.
25.509 Towing loads.
25.511 Ground load: unsymmetrical loads on multiple-wheel units.

WATER LOADS

25.521 General.
25.523 Design weights and center of gravity positions.
25.525 Application of loads.
25.527 Hull and main float load factors.
25.529 Hull and main float landing conditions.
25.531 Hull and main float takeoff condition.
25.533 Hull and main float bottom pressures.
25.535 Auxiliary float loads.
25.537 Seawing loads.

EMERGENCY LANDING CONDITIONS

25.561 General.
25.563 Structural ditching provisions.

FATIGUE EVALUATION

25.571 Fatigue evaluation of flight structure.
25.573 Fatigue evaluation of landing gear.

LIGHTNING PROTECTION

25.581 Lightning protection.

Subpart D—Design and Construction

GENERAL

25.601 General.
25.603 Materials.
25.605 Fabrication methods.
25.607 Fasteners.
25.609 Protection of structure.
25.611 Accessibility provisions.
25.613 Material strength properties and design values.
25.615 Design properties.
25.619 Special factors.
25.621 Casting factors.
25.623 Bearing factors.
25.625 Fitting factors.
25.629 Flutter, deformation, and fail-safe criteria.
25.631 Bird strike damage.

CONTROL SURFACES

Sec.
25.651 Proof of strength.
25.655 Installation.
25.657 Hinges.

CONTROL SYSTEMS

25.671 General.
25.672 Stability augmentation and automatic and power-operated systems.
25.673 Two-control airplanes.
25.675 Stops.
25.677 Trim systems.
25.679 Control system gust locks.
25.681 Limit load static tests.
25.683 Operation tests.
25.685 Control system details.
25.689 Cable systems.
25.693 Joints.
25.697 Lift and drag devices, controls.
25.699 Lift and drag device indicator.
25.701 Flap interconnection.

LANDING GEAR

25.721 General.
25.723 Shock absorption tests.
25.725 Limit drop tests.
25.727 Reserve energy absorption drop tests.
25.729 Retracting mechanism.
25.731 Wheels.
25.733 Tires.
25.735 Brakes.
25.737 Skis.

FLOATS AND HULLS

25.751 Main float buoyancy.
25.753 Main float design.
25.755 Hulls.

PERSONNEL AND CARGO ACCOMMODATIONS

25.771 Pilot compartment.
25.772 Pilot compartment doors.
25.773 Pilot compartment view.
25.775 Windshields and windows.
25.777 Cockpit controls.
25.779 Motion and effect of cockpit controls.
25.781 Cockpit control knob shape.
25.783 Doors.
25.785 Seats, berths, safety belts, and harnesses.
25.787 Stowage compartments.
25.789 Retention of items of mass in passenger and crew compartments.
25.791 Passengers information signs.

EMERGENCY PROVISIONS

25.801 Ditching.
25.803 Emergency evacuation.
25.805 Flight crew emergency exits.
25.807 Passenger emergency exits.
25.809 Emergency exit arrangement.
25.811 Emergency exit marking.
25.812 Emergency lighting.
25.813 Emergency exit access.
25.815 Width of aisle.
25.817 Maximum number of seats abreast.

VENTILATION AND HEATING

25.831 Ventilation.
25.833 Heating systems.

PRESSURIZATION

Sec.
25.841 Pressurized cabins.
25.843 Tests for pressurized cabins.

FIRE PROTECTION

25.851 Fire extinguishers.
25.853 Compartment interiors.
25.855 Cargo and baggage compartments.
25.857 Cargo compartment classification.
25.859 Combustion heater fire protection.
25.863 Flammable fluid fire protection.
25.865 Fire protection of flight controls, engine mounts, and other flight structure.
25.867 Fire protection; other components.

MISCELLANEOUS

25.871 Leveling means.
25.875 Reinforcement near propellers.

Subpart E—Powerplant

GENERAL

25.901 Installation.
25.903 Engines.
25.905 Propellers.
25.907 Propeller vibration.
25.925 Propeller clearance.
25.929 Propeller deicing.
25.933 Reversing systems.
25.934 Turbojet engine thrust reverser system tests.
25.937 Turbopropeller-drag limiting systems.
25.939 Turbine engine operating characteristics.

FUEL SYSTEM

25.951 General.
25.953 Fuel system independence.
25.954 Fuel system lightning protection.
25.955 Fuel flow.
25.957 Flow between interconnected tanks.
25.959 Unusable fuel supply.
25.961 Fuel system hot weather operation.
25.963 Fuel tanks: general.
25.965 Fuel tank tests.
25.967 Fuel tank installations.
25.969 Fuel tank expansion space.
25.971 Fuel tank sump.
25.973 Fuel tank filler connection.
25.975 Fuel tank vents and carburetor vapor vents.
25.977 Fuel tank outlet.
25.979 Pressure fueling system.
25.981 Fuel tank temperature.

FUEL SYSTEM COMPONENTS

25.991 Fuel pumps.
25.993 Fuel system lines and fittings.
25.994 Fuel system components.
25.995 Fuel valves.
25.997 Fuel strainer or filter.
25.999 Fuel system drains.
25.1001 Fuel jettisoning system.

OIL SYSTEM

25.1011 General.
25.1013 Oil tanks.
25.1015 Oil tank tests.

Sec.
25.1017 Oil lines and fittings.
25.1019 Oil strainer or filter.
25.1021 Oil drains.
25.1023 Oil radiators.
25.1025 Oil valves.
25.1027 Propeller feathering system.

COOLING

25.1041 General.
25.1043 Cooling tests.
25.1045 Cooling test procedures.

INDUCTION SYSTEM

25.1091 Air induction.
25.1093 Induction system deicing and anti-icing provisions.
25.1101 Carburetor air preheater design.
25.1103 Induction system ducts.
25.1105 Induction system screens.
25.1107 Inter-coolers and after-coolers.

EXHAUST SYSTEM

25.1121 General.
25.1123 Exhaust piping.
25.1125 Exhaust heat exchangers.
25.1127 Exhaust driven turbo-superchargers.

POWERPLANT CONTROLS AND ACCESSORIES

25.1141 Powerplant controls: general.
25.1143 Engine power and thrust, and anti-detonant injection system controls.
25.1145 Ignition switches.
25.1147 Mixture controls.
25.1149 Propeller speed and pitch controls.
25.1153 Propeller feathering controls.
25.1155 Reverse thrust and propeller pitch settings below the flight regime.
25.1157 Carburetor air temperature controls.
25.1159 Supercharger controls.
25.1161 Fuel jettisoning system controls.
25.1183 Flammable fluid-carrying components.
25.1165 Engine ignition systems.

POWERPLANT FIRE PROTECTION

25.1181 Designated fire zones; regions included.
25.1182 Nacelle areas behind firewalls, and engine pod attaching structures containing flammable fluid lines.
25.1183 Flammable fluid-carrying components.
25.1185 Flammable fluids.
25.1187 Drainage and ventilation of fire zones.
25.1189 Shutoff means.
25.1191 Firewalls.
25.1192 Engine accessory section diaphragm.
25.1193 Cowling and nacelle skin.
25.1195 Fire extinguishing systems.
25.1197 Fire extinguishing agents.
25.1199 Extinguishing agent containers.
25.1201 Fire extinguishing system materials.
25.1203 Fire-detector system.

**Subpart F—Equipment**

GENERAL

Sec.
25.1301 Function and installation.
25.1303 Flight and navigation instruments.
25.1305 Powerplant instruments.
25.1307 Miscellaneous equipment.
25.1309 Equipment systems and installations.

INSTRUMENTS: INSTALLATION

25.1321 Arrangement and visibility.
25.1323 Airspeed indicating system.
25.1325 Static pressure systems.
25.1327 Magnetic direction indicator.
25.1329 Automatic pilot system.
25.1331 Instruments using a power supply.
25.1333 Instrument systems.
25.1337 Powerplant instruments.

ELECTRICAL SYSTEMS AND EQUIPMENT

25.1351 General.
25.1353 Electrical equipment and installations.
25.1355 Distribution system.
25.1357 Circuit protective devices.
25.1359 Electrical system fire and smoke protection.
25.1363 Electrical system tests.

LIGHTS

25.1381 Instrument lights.
25.1383 Landing lights.
25.1385 Position light system installation.
25.1387 Position light system dihedral angles.
25.1389 Position light distribution and intensities.
25.1391 Minimum intensities in the horizontal plane of forward and rear position lights.
25.1393 Minimum intensities in any vertical plane of forward and rear position lights.
25.1395 Maximum intensities in overlapping beams of forward and rear position lights.
25.1397 Color specifications.
25.1399 Riding light.
25.1401 Anticollision light system.

SAFETY EQUIPMENT

25.1411 General.
25.1413 Safety belts.
25.1415 Ditching equipment.
25.1419 Ice protection.

MISCELLANEOUS EQUIPMENT

25.1431 Electronic equipment.
25.1433 Vacuum systems.
25.1435 Hydraulic systems.
25.1439 Protective breathing equipment.
25.1441 Oxygen equipment and supply.
25.1443 Minimum mass flow of supplemental oxygen.
25.1445 Equipment standards for the oxygen distributing system.
25.1447 Equipment standards for oxygen dispensing units.

Sec.
25.1449 Means for determining use of oxygen.
25.1451 Fire protection for oxygen equipment.
25.1453 Protection of oxygen equipment from rupture.
25.1455 Draining of fluids subject to freezing.
25.1457 Cockpit voice recorders.
25.1459 Flight recorders.

**Subpart G—Operating Limitations and Information**

25.1501 General.

OPERATING LIMITATIONS

25.1503 Airspeed limitations: general.
25.1505 Maximum operating limit speed.
25.1507 Maneuvering speed.
25.1511 Flap extended speed.
25.1513 Minimum control speed.
25.1515 Landing gear speeds.
25.1519 Weight, center of gravity, and weight distribution.
25.1521 Powerplant limitations.
25.1523 Minimum flight crew.
25.1525 Kinds of operation.
25.1527 Maximum operating altitude.
25.1529 Maintenance manual.
25.1531 Maneuvering flight load factors.
25.1533 Additional operating limitations for turbine engine powered airplanes.

MARKINGS AND PLACARDS

25.1541 General.
25.1543 Instrument markings: general.
25.1545 Airspeed limitation information.
25.1547 Magnetic direction indicator.
25.1549 Powerplant instruments.
25.1551 Oil quantity indicator.
25.1553 Fuel quantity indicator.
25.1555 Control markings.
25.1557 Miscellaneous markings and placards.
25.1561 Safety equipment.
25.1563 Airspeed placard.

AIRPLANE FLIGHT MANUAL

25.1581 General.
25.1583 Operating limitations.
25.1585 Operating procedures.
25.1587 Performance information.

APPENDIX A
APPENDIX B
APPENDIX C
APPENDIX D
APPENDIX E
APPENDIX F

AUTHORITY: The provisions of this Part 25 issued under secs. 313, 601, 603, 72 Stat. 752, 775; 49 U.S.C. 1354, 1421, and 1423.

SOURCE: The provisions of this Part 25 contained in Docket No. 5066, 29 F.R. 18291, Dec. 24, 1964, except as otherwise noted.