In re "AGENT ORANGE" PRODUCT
LIABILITY LITIGATION.

MDL No. 381.

United States District Court,
E.D. New York.

Feb. 21, 1984.

David J. Dean, Dean, Falanga, Sinrod & Rose, Carle Place, N.Y., Stephen J. Schlegel, Schlegel & Trafelet, Ltd., Chicago, Ill., Thomas W. Henderson, Pittsburgh, Pa., Benton Musselwhite, Houston, Tex., Aaron Twerski, Hempstead, N.Y., of counsel, for plaintiffs.

Leonard Rivkin, Rivkin, Leff, Sherman & Radler, Garden City, N.Y., Philip Pakula, Townley & Updike, Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, William Krohley, Kelley, Drye & Warren, Thomas Beck, Arthur, Dry & Kalish, Richard Goldstein, Shea & Gould, New York City of counsel, David R. Gross, Budd, Larner, Kent, Gross, Picillo & Rosenbaum, New York City, Paul V. Esposito, Lewis, Overbeck & Furman, Chicago, Ill., Morton B. Silberman, Clark, Gagliardi & Miller, White Plains, N.Y., for defendants.

TABLE OF CONTENTS

I. Introduction .......................... 693

   A. Federal law—for jurisdictional purposes; for substantive purposes; for evidentiary and procedural purposes; and as a model for the states to incorporate in their own law ..................... 694

   B. State law ......................... 695

   C. National consensus law .............. 696

II. Claims of Defendants as Misunderstanding of Posture of Case ...................... 697

III. Conflicts of Law Rules ................. 699

   A. Restatement (Second) .............. 700

      1. Product liability law ............. 701
      2. Government contract defense ..... 701
      3. Punitive damages ............... 705

   B. Governmental Interest ............. 706

   C. Leflar—Better Law ............... 706

III. Conflicts of Law Rules

   D. Traditional ...................... 707

   E. Forum .......................... 708

   F. von Mehren—Reconciling Conflicts .... 709

   G. National Consensus Restated ........ 711

IV. Statutes of Limitations ................. 713

V. Conclusion ........................... 713

PRETRIAL ORDER NO. 92

PRELIMINARY MEMORANDUM ON CONFLICTS OF LAW

WEINSTEIN, Chief Judge:

A considerable number of Vietnam war veterans resident in all or almost all states, Puerto Rico and the District of Columbia and a number of foreign countries, and members of their families, claim to have suffered injury as a result of the veterans' exposure to herbicides in Vietnam. Defendants produced those herbicides. Individual claims, originally filed in all parts of the ;country, were transferred for pretrial purposes to this court. Subject to some powers to opt out, common issues presented by plaintiffs' claims will now be tried together since a class has been certified pursuant to Rule 23. *See In re "Agent Orange" Product Liability Litigation,* P.T.O. 72, 100 F.R.D. 718 (E.D.N.Y.1983). Petition for writ of mandamus denied, 725 F.2d 858 (2d Cir.), *cert. denied, sub nom., Diamond Shamrock Chemicals Co. v. Ryan,* ___ U.S. ___, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).

Plaintiffs have failed to state a cause of action under federal common law for jurisdictional purposes. *In re "Agent Orange" Product Liability Litigation,* 635 F.2d 987 (2d Cir.1980), *cert. denied sub nom. Chapman v. Dow,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). Accordingly, the litigation is grounded upon diversity jurisdiction raising the issue of what substantive law should apply.

As required by *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this court has examined the conflict of law rules of the states in which the transferor courts sit. *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). For the

reasons set forth below, it is concluded that under the special circumstances of this litigation, all the transferor states would look to the same substantive law for the rule of decision on the critical substantive issues.

## I. *Introduction*

Plaintiffs originally sought to base jurisdiction on federal common law relying on federal question jurisdiction. 28 U.S.C. § 1331. This court sustained their contention. *In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 737 (E.D.N.Y.1979). The Second Circuit reversed, concluding, for the purpose of denying federal question jurisdiction, that "there is [no] identifiable federal policy at stake in this litigation that warrants the creation of federal common law rules." 635 F.2d 987, 993, *cert. denied sub nom. Chapman v. Dow*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). The court held that if the action was to continue in the federal courts, jurisdiction must be based on diversity of citizenship. 28 U.S.C. § 1332.

In applying state law, following what is assumed to be the mandate of *Klaxon*, the choice of law methodology used by the states in which transferor courts sit has been examined to predict what law each state would apply.

We recognize that *Klaxon* has been widely criticized and that learned scholars have suggested on the basis of policy and possible constitutional grounds that a federal conflicts of law rule should be applied in diversity cases such as the one before us. *See, e.g.,* R. Bridwell & R. Whitten, The Constitution and the Common Law 135 (1977); R.C. Cramton, D.P. Currie & H.H. Kay, Conflict of Laws, 927–932 (3d ed. 1981); Hart & Wechsler's The Federal Courts and the Federal System, 713–717 (2d ed. by P.M. Bator, P.V. Mishkin, D.L. Shapiro & H. Wechsler, 1973); W.L.M. Reese & M. Rosenberg, Conflict of Laws, 692, 694–695 (7th ed. 1978); E.F. Scoles & P. Hay, Conflict of Laws 112 (1982); C. Wright, Law of Federal Courts, 366–370 (4th ed. 1983); Hill, The Erie Doctrine and the Constitution, 53 Nw.U.L.Rev. 427, 444–45 (1958); Korn, The Choice of Law Revolution: A Critique, 83 Colum.L.Rev. 772, 971 (1983); Trautman, The Relation Between American Choice of Law and Federal Common Law, 41 Law and Contemp.Prob. 105, 120 (Spring 1977). The Supreme Court has, however, "made it clear that the *Klaxon* rule is not to yield to the more modern thinking of conflicts-of-laws scholars." C. Wright, *id.* at 368. *See, e.g., Day and Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975).

Much of the law of conflicts is in a state of flux, development and refinement. Any dogmatism as to the result were the issue to be certified to the highest court of each jurisdiction involved is unwarranted. *See, e.g.,* the most current authoritative and comprehensive review of choice of law problems, Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 772, 956 (1983), and the shorter but trenchant Juenger, Conflict of Laws: A Critique of Interest Analysis, 32 Am.J. of Comp.L. 1 (1984). Nevertheless, given the special facts of this litigation, under any approach utilized today, so far as can reasonably be predicted, the result would be the same: each state would probably apply the same law, that is to say either federal or national common law.

Before starting the analysis, it is well to keep in mind the admonition of Chief Judge Fuld whose "impact upon choice of law has been greater than that of any living judge and probably greater than that of any judge during the present century." Reese, Chief Judge Fuld and Choice of Law, 71 Colum.L.Rev. 548 (1971).

> Justice, fairness and "the best practical result" ... may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation.

*Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). Hope of obtaining a universally accepted result is tempered by Professor von Mehren's reminder that

694

one who expects to achieve results in multistate cases that are as satisfying in terms of standards of justice and of party acceptability as those reached in purely domestic cases is doomed to disappointment.

von Mehren, Choice of Law and the Problem of Justice, 41 Law & Contemporary Problems 27, 42 (1977).

In view of a growing consensus about what the law governing manufacturer's liability is—a problem to be dealt with in a subsequent opinion—there is a convergence between the result required in the instant case under the separate state conflicts of law rules and the separate state substantive tort rules. Thus, the obviously sensible result of treating members of this nation's armed forces and their families in essentially the same way for any injuries suffered in a national war fought on foreign soil would, it is now provisionally found, be reached by each of the states.

The issue is particularly difficult to deal with because of a number of definitional and conceptual issues that tend to make some problems appear more murky than they are. While we disclaim any capacity to clarify the law of conflicts, it does seem helpful for purposes of this opinion to restate some definitions and distinctions.

Essentially, there are five different conflicts of laws methodologies widely used in this country. These may be summarized as (1) traditional or Restatement (First) based upon Professor Beale's work, (2) Restatement (Second) being in large part a pragmatic and conservative revision by Professor Reese of Professor Currie's interest analysis school, (3) governmental interest, (4) Leflar, and (5) forum. There is a sixth proposed approach that has some of the aura of Leflar, but which we treat separately as the von Mehren approach. Some states use a combination or variation of these techniques. *See, e.g.,* for various other characterizations of state approaches: R.C. Cramton, D.P. Currie & H.H. Kay, Conflicts of Laws, 326 ff. (3d ed. 1981); W.L.M. Reese & M. Rosenberg, Conflicts of Laws, 478 ff. (7th ed. 1978); Korn, The

Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 779–780, 819–820 (1983) (stressing New York cases); Rosenberg, The Comeback of Choice-of-Law Rules, 81 Colum.L.Rev. 946 (1981) (stressing California cases). For purposes of this opinion, we have eschewed specific discussion of the effects of modern doctrine leading to renvoi (*see, e.g.,* W.L.M. Reese & M. Rosenberg, Conflicts of Laws 550 (7th ed. 1978) ("Renvoi Returns")), or the increased likelihood of depecage, applying the law of different jurisdictions to different aspects of the case (R.J. Weintraub, Commentary on the Conflict of Laws 72 (2d ed. 1980)), though, as will be seen, both doctrines are implicated in the present case. Finally, it is unnecessary to consider whether any state's conflict of law rule would deprive a litigant of due process, equal protection, or other constitutional right since each of the states whose conflict rule might apply has sufficient nexus with the matter through residence or the like. *See, e.g.,* R.C. Cramton, D.P. Currie & H.H. Kay, Conflict of Laws, 499–508 (3d ed. 1981); Hart & Wechsler's The Federal Courts and the Federal System, 717–718 (2d ed. by P.M. Bator, D.L. Shapiro, P.J. Mishkin & H. Wechsler, 1973). *Cf. Allstate Insurance Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981), *discussed in* Currie, The Supreme Court and Federal Jurisdiction: 1975 Term, 1976 Sup.Ct.Rev. 183, 217 (questioning constitutionality), *and* Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 772, 792–799 (1983).

■ A. *Federal Law—for jurisdictional purposes; for substantive purposes; for evidentiary and procedural purposes; and as a model for the states to incorporate in their own law.* As already suggested, the Court of Appeals has decided that there is no federal substantive law directly controlling in this case upon which federal question jurisdiction of federal district courts may be based under 28 U.S.C. § 1331. Thus, this is not a civil action "arising under the … laws … of the United States." *Id.* Federal substantive law—that is, the law of the United

States Congress, Executive and courts—does not, according to the Second Circuit, apply by direct authority and compulsion of the federal government and the Supremacy clause of the Constitution. For procedural purposes, however, the federal rules of procedure and evidence apply. Federal Rules of Evidence, Rules 101; Federal Rules of Civil Procedure, Rule 1. This means, for example, that in this case, based upon the predicate of diversity of citizenship jurisdiction, the Federal Rules of Civil Procedure governing class actions control. *See In re "Agent Orange" Product Liability Litigation,* P.T.O. 72, 100 F.R.D. 718 (E.D.N.Y. 1983) petition for writ of mandamus denied, 725 F.2d 858 (2d Cir.), *cert. denied, sub nom., Diamond Shamrock Chemicals Co. v. Ryan,* — U.S. —, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).

Even though federal substantive law does not control by its own force, states will often look to non-controlling federal decisions, statutes, executive orders and administrative decisions in deciding what state policy and substantive law ought to be. "The overarching presence of federal law has moved state judges to view federal law ... as a source of inspiration for the development of a state jurisprudence." The Supreme Court, 1982 Term, 97 Harv.L. Rev. 70, 224 (1983) (commenting on *Michigan v. Long,* — U.S. —, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), presuming state decision is based upon federal law in case of ambiguity). Often, then, federal substantive law becomes state substantive law, not because the federal government has willed it so, but because the state has deemed it should be so through its governing institutions including the state's courts.

▪ B. *State Law.* By "state law" we mean the substantive law, as far as it can be predicted to be, devised and enforced by the state within the limits of its constitutional powers. Since this is a diversity jurisdiction case, pursuant to 28 U.S.C. § 1332, this court, as to those claims originally filed in this court, sits much as a state trial court would in New York, applying New York substantive law except when, under the New York law of conflicts, a New York court would look to substantive law other than New York's in deciding what substantive law would apply. Cases commenced in other districts are treated as if they are pending in those other districts whether transferred to this court for pretrial purposes under the multi-district litigation statute, 28 U.S.C. § 1407, or transferred for trial for the convenience of witnesses, 28 U.S.C. § 1404. *See Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); W.L.M. Reese & M. Rosenberg, Conflict of Laws, 194–96 (7th ed. 1978); R.J. Weintraub, Commentary on the Conflict of Laws, 584–87 (2d ed. 1980); Note, Choice of Law in the Federal Court after Transfer of Venue, 63 Cornell L.Rev. 149 (1977).

Certifying this as a class action with residents of different states as plaintiffs does not, we assume for present purposes, by analogy to *Van Dusen v. Barrack,* reduce all disputes within the litigation to one subject to the substantive and conflicts of laws rules of New York. This is arguably clear where the suits were begun in other states and transferred to this court under section 1404 or 1407 of Title 28. It also may be assumed to be the case as to those plaintiffs who never brought suit, but became parties as a result of certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. Where relevant state substantive and conflicts rules are not uniform, certification does not, we will assume, provide uniformity. *Cf. Snyder v. Harris,* 394 U.S. 332, 334, 89 S.Ct. 1053, 1055, 22 L.Ed.2d 319 (1969); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1023, 85 L.Ed. 1477; *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *In re No. Dist. of Cal. "Dalkon Shield" IUD Product Liability Litigation,* 693 F.2d 847, 850 (9th Cir.1982), *cert. denied sub nom. A.H. Robins v. Abed,* — U.S. —, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

This assumption is made despite the contrary argument—with great appeal for reasons beyond the scope of this opinion—that these class members are subject to New York conflicts law since they constructively sued in the New York case by analogy to

Fed.R.Civ.P. Rule 24 (intervention) or Rule 42 (consolidation). Although we do not find it necessary to adopt this argument, it is clear that class action certification provides no added support for applying conflicts of law rules to require differing substantive law. *Cf. Young v. That Was The Week That Was*, 312 F.Supp. 1337 (N.D. Ohio 1969), *aff'd*, 423 F.2d 265 (6th Cir. 1970) (class action certification, particularly where the law respecting conflicts was not clear, warranted using the law of one state even though members of the class came from many states whose law would apply under traditional conflicts rules).

C. *National-Consensus Law.* While those close to the American law scene tend to emphasize the diversity of substantive law among the states and between the states and the federal government, to outside observers much of the differences must appear as significant as that among the Lilliputians to Swift's hero. Faced with a unique problem, American lawmakers and judges tend to react in much the same way, arriving at much the same result.

There are, of course, centrifugal forces in the law leading to different substantive and procedural results even in a single nation like the United States. With thousands of municipalities, 50 states, the District of Columbia and the Federal jurisdiction having many law-creating legislative bodies, executive departments, administrative bodies, and courts, this is to be expected. Yet, powerful centripetal tendencies often encourage the formulation of national consensus law. First, is the essential homogeneity of our unified technological-social structure increasingly tied together by national transportation, communication and educational-cultural networks. Second, is an Anglo-American legal system with common roots and a strongly integrated law school educational system relying upon national scholars, treatises and cases. National casebooks and fungibility of teaching materials, for example, create a strong unifying influence making it possible for lawyers to be trained in one section of the country and to transfer to other areas for practice. It allows development

of a national bar examination and a national bar even though lawyers are licensed in different states. The result is that lawmaking and law-applying authorities tend to utilize national standards and approaches.

Institutions such as the American Law Institute with its Restatements, the National Commissioners on Uniform State Laws with many widely-adopted uniform statutes and the National Municipal League with its uniform charters aid these unifying national tendencies. So, too, do many quasi-public bodies setting manufacturing and safety standards. The pressure, for example, for a uniform manufacturers liability substantive law is well known, having even led the Department of Commerce to draft federal legislation on the subject.

When presented with a new problem, we tend to proceed by analogy and by precedent. Analogies available are much the same for all courts. Even though one state is not bound by the precedents of another, when a new problem arises courts tend to follow the decisions of courts of other American jurisdictions since the reasoning and pool of factual and legal data will tend to be the same.

The concept of a national law already exists in federal common law since federal law, by definition, is created to deal with problems that are national in scope. In determining the content of that federal law courts have long looked to state law sources, the Restatement of Law of the American Law Institute and other "non-federal" sources. *See, e.g., Miree v. De-Kalb County*, 433 U.S. 25, 30, 97 S.Ct. 2490, 2494, 53 L.Ed.2d 557 (1977); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943); *Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Southern Pacific Transportation Co. v. United States*, 462 F.Supp. 1193 (E.D.Cal.1978); *Weinberger v. New York Stock Exchange*, 335 F.Supp. 139, 143 (S.D.N.Y.1971).

We need not leave to speculation the assumption that states recognize this Agent Orange litigation as one 1) with strong national overtones and 2) that is *sui generis.* Some states have enacted statutes of limitation expressly extending the time available for "Agent Orange" plaintiffs to sue. *See, e.g.,* 1983 Conn.Pub.Acts No. 83–15; N.Y.Civ.Pract.R. § 214–b (McKinney 1983); Ohio Rev.Code Ann. § 23.05.10; R.I.Gen.Laws § 9–1–14.2; W.Va.Code § 16–28–10. Other state legislatures have set up commissions and outreach programs to study the problem and assist veterans or their dependents in pursuing Agent Orange claims against the United States. *See, e.g.,* Assembly Bill No. 14, 1982 Cal.Legis.Serv. Ch. 48 (West); 1981 Ill.Laws 82–116; 1983 Ill.Laws 83–283; 1983 Ind.Acts 1122; Ind.Code Ann. § 10–5–241 to § 10–5–24–3; 1983 Iowa Acts 617; Kan.Stat.Ann. § 73–1701 to § 1703; Minn.Stat.Ann. § 196.19 to § 196.-26 (West 1984); Minn.S.Res. 9, 1983, Minn. Sess.Law Serv.; Okla.Stat.Ann. Tit. 72, § 350 to § 358; 1983 Or.Laws C. 658; Pa. Stat.Ann.Tit. 51, § 20271 to § 20182 (Purdon); Tex.Rev.Civ.Stat.Ann. art. 4447W; W.Va.Code § 16–28–1 to § 16–28–10.

## II. *Claims of Defendants and Misunderstanding of Posture of Case*

With this general background we may now examine defendants' contentions that the Court of Appeals' decision that plaintiffs did not state a cause of action under federal common law forbids this court from using any single rule of substantive law. They argue in summary that (1) federal common law may only be applied where there is a substantial federal interest at stake, (2) the Second Circuit's decision constitutes a determination binding on this court that there is no such federal interest in this litigation, and (3) therefore, although they do not suggest any rational way by which a state may choose one state's law to apply, they conclude that this court may not apply federal or national consensus common law to any issue. Further, they suggest that there is no single national consensus substantive law (although at least one defendant on oral argu-

ment urged that the government contract defense rested on a national consensus).

■ Defendants misstate the holding of the Court of Appeals. That decision was jurisdictional only—that the federal courts did not have jurisdiction under 28 U.S.C. § 1331. It did not constitute a determination that the state courts could not or would not look to other law, whether state, federal, or national consensus, if their choice of law rules so dictated. There is no necessary congruity between the basis for competence of a court and the basis for choice of law. *Cf.* Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L. Rev. 772, 781–787 (1983) (relation between choice of law bases and in personam jurisdiction bases). Nor did the Court of Appeals decide that there was no substantial federal interest in the case. On the contrary, it is clear from the opinion that it did not disagree with this court's conclusion that there are "substantial federal interests that would be adversely affected by application of state law to the instant claims and ... that there [are] no substantial state interests in having state law applied." 635 F.2d at 991. *See id.* at 993 n. 11. Rather, the Court of Appeals found that although the federal government had an interest in both the plaintiffs as former servicemen and the defendants as defense contractors, those "two interests have been placed in sharp contrast with one another." *Id.* at 994. Because of this clash and the fact that "the federal government['s] ... interest in the *outcome* of the litigation, *i.e.* in how the parties' welfares should be balanced, is as yet undetermined," *id.* at 995 (emphasis in original), the Court of Appeals determined that there was no "significant conflict between [identifiable] federal policy or interest and the use of state law." *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966), *quoted in Agent Orange,* 635 F.2d at 993. As a result, the strict requirements for the application of federal common law of its own force were, according to the Court of Appeals, not met. There have been several developments

since the Second Circuit's decision that are material to an understanding of its scope, rationale and holding.

First, the Second Circuit has declared that it has not yet decided whether or not the government contract defense is governed by federal law. *In re "Agent Orange" Product Liability Litigation*, 725 F.2d 858, 861 n. 2 (2d Cir.1984). That point seems clear since any such decision on a defense raised by answer would have been irrelevant to federal question jurisdiction. *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, — U.S. —, 103 S.Ct. 2841, 2846–47, 77 L.Ed.2d 420 (1983); *Tennessee v. Union & Planters' Bank*, 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511 (1894).

Second, subsequent to the Second Circuit's decision, there has been a further expression by the federal government of its interest in the issues raised by this case. In Pub.L. No. 97–72, 95 Stat. 1047 (1981), Congress authorized the Veterans Administration to provide veterans who were exposed to Agent Orange and who claim injury from such exposure out-patient and in-patient hospital and nursing home care at VA facilities without a need to prove a causal relationship between the exposure and the illness. It has also expanded significantly the scope of the study of the effects of Agent Orange on Vietnam veterans, originally ordered by Pub.L. No. 96–151, 93 Stat. 1097 (1979). Both the Veterans Administration and Congress are actively studying the effects of Agent Orange on veterans. The Vietnam Veterans' Agent Orange Relief Act: Hearings on H.R. 1961 Before the Subcomm. on Compensation, Pension, and Insurance of the House Committee on Veterans' Affairs, 98 Cong., 1st Sess. 11 (1983) (statement of Harry Walters, Administrator, Veterans' Administration, noting the government studies that are underway on Agent Orange); *id.* at 123 ff. (statement of Dorothy Starbuck, Chief Benefits Director, Veterans' Administration, commenting on H.R. 1961 and noting the various diseases from which Agent Orange victims allegedly suffer).

Third, the Second Circuit's holding was premised at least in part on the fact that the claims "do not directly implicate the rights and duties of the United States" and that "no substantial rights or duties of the government hinge on the outcome." 635 F.2d at 993. While not decisive in connection with the instant conflicts of laws opinion, that is no longer true. The government is a third-party defendant at least as to those claims alleging independent injury to wives, as by miscarriages, and to children, as by genetic damage. *In re "Agent Orange" Product Liability Litigation*, P.T.O. 91, 580 F.Supp. 1242 (E.D.N.Y.), Petition for Writ of Mandamus Denied, 733 F.2d 10 (2d Cir.1984).

The difference between federal law applying of its own force under the Supremacy Clause, which the Second Circuit's decision forbids in part, and applying a form of national consensus law or of federal law itself because a state court chooses to look to it as the rule of decision is well accepted. For example, state courts, in interpreting their state's constitution and statutes, will often follow the federal constitution and statutory authority although they may not be required to do so. *See, e.g., Jankovich v. Indiana Toll Road Comm'n*, 379 U.S. 487, 85 S.Ct. 493, 13 L.Ed.2d 439 (1965) (Indiana Supreme Court's holding based on state constitutional grounds although elaborate use made of federal authority); *Beeland Wholesale Co. v. Kaufman*, 234 Ala. 249, 260, 174 So. 516 (1937) (state court, upon direction of state legislature, passed on contention that federal statute was invalid because validity of state statute tied to federal statute). States will often look to federal tax laws and federal rules of procedure in formulating and interpreting their own. *See, e.g.,* Idaho Code §§ 63–3001 to 63–3087 (Supp.1971) (having stated aim of making taxable income "identical" with federal, subject only to specific modifications); Ky.Rev.Stat.Ann. § 141.010(9), 141.050 (1971) (gross income defined in terms of federal internal revenue code; explicit reference made to judicial interpretations of the federal code); *see also* Note, Supreme Court Review of State Interpretations of Federal Law Incorporated by Reference, 66 Harv.L.Rev. 1498 (1953). In all of the above examples, states are looking

to the federal government for the rule of decision despite the fact that no one would contend that the federal rule must be applied.

Federal courts recognize this state practice when they apply federal law to a situation because they find the state court would apply it as a matter of policy. *Compare Davis v. United Air Lines*, 575 F.Supp. 677 (E.D.N.Y.1983) (applying federal law to third-party beneficiary claim in diversity case because, under *Klaxon*, state would apply federal law) *with Howard v. Uniroyal, Inc.*, 543 F.Supp. 490 (M.D.Ala. 1981) (applying federal law for identical claim because of Supremacy Clause). *Cf. Southern Pacific Transp. Co. v. United States*, 462 F.Supp. 1193, 1213–14 (E.D.Cal. 1978) (although Federal Tort Claims Act provides that state law is to be applied, if state would look to federal law, federal law will apply). Similarly, a state in applying a sister state's law, will generally do so as a matter of policy, not because the federal Constitution compels such application.

It is also noteworthy that federal courts applying federal law in exercising federal question jurisdiction often look to state law to fill in large substantive gaps as in civil rights (42 U.S.C. § 1983) and other cases. *See, e.g.*, cases collected in *Wahba v. H. & N. Prescription Center*, 539 F.Supp. 352, 357–358 (E.D.N.Y.1982). *Cf. Thompson v. Village of Hales Corners*, 115 Wis.2d 289, 340 N.W.2d 704 (1983) (in determining damages under § 1983, state court applies federal law which incorporates state law except when state law is incompatible with federal policy).

This free interchange of federal and state law and the reliance on a common American fund of legal concepts is to be expected. We are, after all, as already noted, a single nation whose lawyers and judges think of themselves as members of a single American profession, with a common jurisprudence and a homogeneous society. Analytically, the difference between ruling federal and state substantive law is precise; in practice, the distinctions are often blurred or nonexistent.

### III. *Conflict of Laws Rules*

While there are a number of analogous approaches and decisions, none is directly on point in connection with the special conflicts of law issue now posed. Accordingly, since "no clearly discernable and clearly applicable conflicts rule has been announced by the ... state, the rule must be hypothesized to correspond with all available indices of what the rule would be if presently formulated" by the state courts. *Stemple v. Phillips Petroleum Co.*, 430 F.2d 178, 183 (10th Cir.1970).

Modern approaches, although differing in their formulations, mandate an analytical inquiry which is essentially the same. As Professor Leflar put it:

> [I]t appears that the various scholarly views concerning choice of law, developed during the last couple of decades, are being accepted by the courts as though they constituted one somewhat multi-faceted approach to the subject. Essentially, they are consistent with each other. Any one of them is likely to produce about the same result on a given set of facts as will another.
>
> The point to be emphasized is that the modern decisions, regardless of exact language, are substantially consistent with each other.

Leflar, American Conflicts Law, § 109, p. 218 (3d ed. 1977). *See also In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 644 F.2d 594, 610 (7th Cir.1981). The Restatement Second is the most comprehensive of the modern approaches. *See* Leflar, Choice of Law: State's Rights, 10 Hofstra L.Rev. 203, 206 (1981). To the extent that they differ from the current Restatement, other approaches are analyzed below.

While not covering all of these techniques, the following analysis which touches upon the Restatement (Second), governmental interest, Professor Leflar's better law, traditional or Restatement (First), forum law and Professor von Mehren's reconciling conflicts approaches, suffices for purposes of this opinion.

A. *Restatement (Second)*

Section 6 of the Restatement (Second) of Conflicts sets forth the general principles to be applied by a court in deciding what substantive law governs. It requires a comprehensive analysis of many interlocking local and national policies whenever a new problem is posed:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rules of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Section 145 of the Restatement lists the factors to be considered when applying the principles of Section 6 to a torts case. They include a wide array of relationships of the parties and their contacts with various jurisdictions:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

While individual factors must be analyzed, "the 'most significant relationship' analysis should not turn on the number of contacts but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in Section 6." *Gutierrez v. Collins*, 583 S.W.2d 312, 319 (Tex.1979).

Applying the contacts enumerated in section 145(2) to the facts of this litigation reflects their widespread geographical location and fortuity. Injuries arguably occurred in the fifty states and other nations where the plaintiffs now live or at one time lived. The original exposure to Agent Orange was at a variety of places in and near Vietnam—*i.e.*, South Vietnam, Cambodia and Laos. The conduct causing the injury was the manufacture of Agent Orange by the defendants and the alleged failure by the defendants to warn the government of the dangers of Agent Orange. Agent Orange was manufactured in factories in New Jersey, Michigan, Arkansas, West Virginia, Missouri and Canada, and perhaps Germany and elsewhere. The basic decision to use it was made in and around Washington, D.C. and in South Vietnam by our government officials and those of South Vietnam. The companies responsible for its manufacture are incorporated and have as their main place of business the states of Delaware, New Jersey, Ohio, Michigan, Missouri, Kansas and Connecticut; treated as a unit, their combined sales run into the billions of dollars and have a substantial impact in every state of the union and in many foreign countries. It is difficult to pinpoint any particular states as the location of the failure to warn since what is alleged is inaction, not action. However, the meetings and conferences which plaintiffs allege furthered what they refer to as

the "conspiracy of silence" took place in the various states where defendants have their principal place of business. Other states with relevant contacts include Pennsylvania and Texas, where the Herbicide Management Team of the United States armed forces was located, Alabama and Mississippi, the states from where the Agent Orange was shipped, and South Vietnam, where it was stored and used.

Adding to the factual complexity is that of mixture. The products manufactured were so mixed and so labeled that it is not possible to determine which manufacturer's product was used at any time or place.

■ The Restatement Second's comment on § 6(b) distinguishes "the forum [that] has no interest in the case apart from the fact that it is the place of the trial of the action," from "the forum [that] has an interest in the case apart from the fact that it is the place of the trial." In the former, the policies behind the substantive law of the forum will be irrelevant. Restatement of Conflicts (Second), § 6, comment e. Thus, for those cases in which neither the plaintiff nor the defendant has any significant contact with the state other than the fact that suit was filed in that state, that state's policies will not be considered. For those cases in which parties do have a significant contact with the forum such as the residence, place of business or state of incorporation of the parties, the policies behind the substantive laws must be considered. The three most important issues whose policies must be analyzed for this preliminary conflicts-of-laws opinion are products liability, the government contract defense and punitive damages. The articulation of the substantive rules relating to these issues will be restated in a more definite form in subsequent decisions; a rough approximation of these rules for the purposes of this conflicts opinion suffices.

### 1. *Product Liability Law*

Virtually all, if not every one, of the states in question has adopted some form of products liability law either by caselaw or by statute. The general policy behind such a rule of law to shift costs from the injured plaintiff to the manufacturer is reflected in the oft quoted statement in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 700, 377 P.2d 897, 900 (1962):

> The purpose of such liability is to ensure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.

Products liability law generally will be treated at greater length in a subsequent opinion. For the moment, it is enough to say that much the same considerations controlling choice of law in the government contract defense, discussed at length below, apply to product liability law generally. They tend to lead to application of federal law or of a law of national consensus.

### 2. *Government Contract Defense*

■ Although the government contract defense has long been applied by the state courts, few decisions have faced the question of how the defense applies to a claim of products liability. The term "government contract defense" has two forms: the "contract specification" defense and the "government contract" defense. Under the former, a manufacturer is insulated from liability if it manufactured the product in accordance with government specifications, unless those specifications were so obviously defective that a competent manufacturer would have refused to follow them. Under the latter, a manufacturer's compliance with government specifications is a complete defense to any action based on defective design. *See* Note, Liability of a Manufacturer for Products Defectively Designed by the Government, 23 Boston College L.Rev. 1023, 1085 (1982).

Two state courts have recently had occasion to discuss the government contract defense in the context of a strict liability action involving allegedly defective military products. *See Sanner v. Ford Motor Co.*,

144 N.J.Super. 1, 364 A.2d 43 (1976), *aff'd*, 154 N.J.Super. 407, 381 A.2d 805 (1977), *cert. denied*, 75 N.J. 616, 384 A.2d 846 (1978); *Casabianca v. Casabianca*, 104 Misc.2d 348, 428 N.Y.S.2d 400 (Sup.Ct. 1980). In allowing the defense, the *Sanner* court reasoned that imposing liability "would seriously impair the governments [*sic*] ability to formulate policy and make judgments pursuant to its war powers." *Sanner*, 144 N.J.Super. at 9, 364 A.2d at 47. New York embraced much the same policy in *Casabianca*, allowing the defense even though the manufacturer believed the design imprudent and dangerous.

Two related policies have been expressed by other state courts in allowing the government contract defense in other contexts. The first views the government contract defense as following from the notion of sovereign immunity. As the court in *Valley Forge Gardens, Inc. v. James D. Morrissey, Inc.*, 385 Pa. 477, 483–84, 123 A.2d 888, 891 (1956), put the matter:

> [I]f the contractor, in privity with the state or with its instrumentality, performs the contract work which the state is privileged to have done, ... the contractor [is relieved] from liability to third persons except for negligence or willful tort in performance of the work.

Another policy has been referred to as the "efficiency" rationale, *i.e.*, that the defense is necessary to ensure the smooth operation of government procurement programs:

> [I]f the rule were otherwise, "the bidding on the contracts with a [governmental instrumentality] would be somewhat hazardous, because the contractor could never know what the amount of damage which he might have to pay ... would be."

*Valley Forge*, 385 Pa. at 484, 123 A.2d at 891–92 (citations omitted). *See also McCabe Powers Body Co. v. Sharps*, 594 S.W.2d 592 (Ky.1980); *Hunt v. Blasius*, 55 Ill.App.3d 14, 12 Ill.Dec. 813, 817–18, 370 N.E.2d 617, 621–22 (1977), *aff'd on other grounds*, 74 Ill.2d 203, 23 Ill.Dec. 574, 384 N.E.2d 368 (1978).

Other courts have rejected the government contract defense, at least where the claim was grounded in strict product liability. *See Challoner v. Day and Zimmerman, Inc.*, 512 F.2d 77, 84 (5th Cir.) (applying Texas law), *rev'd on other grounds*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Johnston v. United States*, 568 F.Supp. 351, 356–359 (D.Kan.1983) (applying Kansas law); *see also* Note, The Government Contract Defense in Strict Liability Suits for Defective Design, 48 U.Chi.L.Rev. 1030 (1980). They reason that the contract specification defense, having its source in ordinary negligence, does not apply to actions grounded in strict liability. As to the government contract defense proper, those courts that deny the defense in strict liability cases tip the balance in favor of the injured plaintiff rather than the contractor, asking:

> On what principled ground ... could it be justified that the cost of manufacturing defects will be passed along, through higher contract prices to the government to all of us who are taxpayers, while the design defect "tax" will fall only on a few unfortunate, innocent, randomly selected victims?

*Johnston*, 568 F.Supp. at 357.

Having analyzed, under Restatement § 6(2)(b), the relevant policies of the various forum states, it is suggested that we select the law of one of those fora to be applied to one or more of the substantive issues in this litigation. Yet it has already been pointed out that considering only the defendants' principal places of business and manufacture and principal contacts relevant to the conduct causing the injury, we count more than twenty jurisdictions. If to these jurisdictions are added the states and counties which bear much of the expense of caring for the service people, spouses and children who need public assistance, the number of jurisdictions far exceeds fifty. This complexity is compounded by the fact that at least three of the foreign countries involved—Canada, Australia and New Zealand—are themselves federal republics with federal-state issues not unlike our own.

The class action nature of the litigation, as already indicated, will not be assumed to control the choice-of-law aspect of the case. Nevertheless, a state court passing on the claims of an individual or a group of veterans might well recognize the unfairness in treating differently legally identical claims involving servicemen who fought a difficult foreign war shoulder-to-shoulder and were exposed to virtually identical risks. As the Supreme Court stated in a related context, because "the Armed Services perform a unique, nationwide function in protecting the security of the United States," it makes "little sense for the Government's liability to members of the Armed Services [to be] dependent on the fortuity of where the soldier happened to be stationed at the time of his injury." *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977). Similarly, it would make little sense to have a serviceman's recovery (or that of a spouse or child) in this suit depend on the fortuity of where he manifested his injuries or where he filed suit.

█ It quickly becomes apparent that it is impossible through sensible application of Restatement (Second) choice of law doctrine or analysis to identify the interest of any one state as being sufficiently greater than that of any others to a degree sufficient to justify the application of that state's law in resolving the issues in this litigation. Any narrow and mechanical state choice of law system simply collapses under the weight of the multiplicity of contacts, policies and unarticulated or conflicting state interests in this unique case. A state court, therefore, because of its inability to identify and select any other state's law to be applied as the rule of decision and because of the need for uniformity across the country, would seek to divine what the national rule of decision with regard to product liability law would be so that such law would appropriately reflect the national and international characteristics of this case. By contrast, the application of an individual state's law rather than a federal law or a national consensus law would be irrational and unfair.

The use of federal or national common law is also justified by Restatement of Conflict of Laws (Second) § 6(2)(c), which requires an analysis of "the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue." The other interested state whose interest and policies must be considered is, of course, the United States which, under § 3 comment (c) of the Restatement, "is a state in the sense here used as to matters that are governed by federal law."

The policies of the United States, broadly speaking, parallel the states': on the one hand, it has a policy of compensating servicemen who are injured in the course of military service. On the other hand, there is the policy expressed by the government contract defense of insulating defense contractors who merely produced military equipment according to the specifications set forth by the government. *See McKay v. Rockwell Intern. Corp.,* 704 F.2d 444, 448–451 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). How the balance should be struck in this case between those two conflicting policies need not be decided at this point. What is important is that these federal policies are far more specific than those of the states and the national interest in this litigation is far greater than that of any individual state. *See McLaughlin v. Sikorsky Aircraft,* 148 Cal.App.3d 203, 195 Cal.Rptr. 764, 768 (1983) (federal law applies to the government contract defense).

While somewhat inchoate, the sense of the nation's interest is paramount to any state's. In matters affecting the nation as a whole, the concept of a single nation with interests overriding those of any state on some matters has never been doubted since the Civil War. Judges cannot blind themselves to what every reasonable citizen of the country absorbs from the cultural brew he or she imbibes from childhood, that help shape intellectual and emotional fibers. Judges, law professors and lawyers are no

different from others in this respect. Seldom will the law they apply depart from the sense of the situation that the facts of the real world present.

This suit involves tens of thousands of servicemen and their wives and children alleging injury abroad in time of war as a result of a military decision. As opposed to the general policy behind products liability which encompasses all those injured by defective products, there is a far more specific federal policy of ensuring compensation for injured members and veterans of the armed forces. *See* 10 U.S.C. § 1071–87 (program of medical care for members of uniformed services and dependents); 38 U.S.C. §§ 310–15 (schedule of compensation to veterans and dependents for wartime disabilities); §§ 321–22 (schedule of compensation to survivors of veterans for wartime death), § 331–35 (same, peacetime disabilities), § 34–42 (same, peacetime death). Furthermore, Congress has recently expressed a specific policy in favor of the plaintiffs, not just as servicemen, but as "Agent Orange" victims. In Pub.L. No. 97–72, 95 Stat. 1047 (1981), Congress authorized the Veterans Administration to provide veterans who allege injury by exposure to Agent Orange with out-patient and in-patient hospital and nursing care at VA facilities without proving a causal relationship between the exposure and the illness and without regard to ability to pay. The same law also significantly expanded the scope of the study of the effects of Agent Orange on Vietnam veterans originally ordered by Pub.L. No. 96–151, 93 Stat. 1097 (1979). While such federal regulation does not mean that the federal government has preempted state tort law (*cf. Silkwood v. Kerr-McGee Co.,* —— U.S. ——, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)), it is an expression of federal policy that state courts would not be likely to ignore.

For much the same reasons, the national interest is far greater than that of the individual states. While the individual states may have a general interest in having their citizens recover or their chemical companies protected from liability, the nation as a whole has a far more specific interest in both the plaintiffs, as servicemen, and the defendants, as government contractors. As to the plaintiffs, the Supreme Court observed in *United States v. Standard Oil Company,* 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947):

> Perhaps no relation between the government and a citizen is more distinctively federal in character than that between it and members of its armed forces. To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or non-federal governmental agencies, the scope, nature, legal incidents and consequences of the relation between persons in service and the government are fundamentally derived from federal sources and governed by federal authority. *See Tarble's Case,* 80 U.S. 397, 13 Wall. 397, 20 L.Ed. 597; *Kurtz v. Moffitt,* 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458. So also we think are interferences with that relationship such as the facts of this case involved. For, as the Federal Government has the exclusive power to establish and define the relationship by virtue of its military powers, equally clearly it has power in execution of the same functions to protect the relation once formed from harms inflicted by others.

*Id.* 332 U.S. at 305–306, 67 S.Ct. at 1606–1607 (footnotes omitted). *See also Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977). The federal government has also expressed its interest in the plaintiffs as "Agent Orange" victims. In two days of Congressional hearings, members of Congress and the Administration, while differing on what action to take, agreed on the national scope and federal nature of the problem. Thus, to cite just two examples, Dorothy Starbuck, Chief Benefits Director of the Veterans' Administration, stated that "we in the VA share with ... Congress the desire for a meaningful Federal response" to the problems of Vietnam veterans who were exposed to Agent Orange. The Vietnam Veterans

Agent Orange Relief Act: Hearings on H.R.1961 Before the Subcomm. on Compensation, Pension, and Insurance of the House Committee on Veterans' Affairs, 98th Cong., 1st Sess. 123 (1983). Congressman Daschle, sponsor of the Vietnam Veterans Agent Orange Relief Act, noted the interest of "Congress and the American people" in "making progress on the [A]gent [O]range issue." *Id.* at 3. *See also,* Agent Orange and Atomic Veterans Relief Act, H.R. 98th Cong., 2d Sess., Rep. 98–952 (Jan. 25, 1984). These expressions of Congressional concern are, of course, in addition to Pub.L. No. 97–72 and Pub.L. No. 96–151, already referred to.

There is as well a specific interest which individual states would hardly ignore. It inheres in the possible liability of the defendants, as contractors, to the soldiers and members of their families. As the Supreme Court stated in *Stencel Aero,* "[t]he relationship between the Government and its suppliers of ordnance is certainly no less 'distinctively federal in character' than the relationship between the Government and its soldiers." 431 U.S. at 672, 97 S.Ct. at 2054.

■ Moreover, ordinarily federal law controls the construction and applicability of government contracts. *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947). *See also American Houses, Inc. v. Schneider,* 211 F.2d 881 (3d Cir.1954); Note, The Choice of Law, State or Federal, in Cases Involving Government Contracts, 12 La.L.Rev. 37, 55 (1951) ("the trend seems to indicate clearly that 'federal common law' will be applied in those cases involving government contracts").

The existence and scope of a contractor's liability, if any, will undoubtedly affect future dealings between the contractor and the government. For example, war contractors may increase the price of war materials to reflect their potential liability. They may balk at supplying the military with particular products. As a result, the government's military capabilities may be affected. In addition, the importance of large government war contractors to the national economy implicates a national interest transcending state boundaries. Defendants, who include many of the nation's largest chemical manufacturers, face claims which may result in billions of dollars in liability. The sudden onset of substantial liabilities, even if they fell short of defendants' total assets, may affect national interests both in the sense that it may affect the federal treasury and in the sense that it would seriously affect the national economy. Furthermore, this litigation involves defoliants and other toxic chemicals whose use and misuse are increasingly governed by federal law. *See, e.g.,* the Toxic Substances Control Act, 15 U.S.C. § 2601, *et seq.;* the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, *et seq.;* the Dangerous Cargo Act, 46 U.S.C. § 170; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.;* the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136, *et seq.;* the Resource Conservation Recovery Act, 42 U.S.C. § 6901, *et seq.* Comprehensive federal legislation has, in large part, taken these products out of the domain of state regulation.

### 3. *Punitive Damages*

■ The third issue of substantive law whose policies must be analyzed for choice-of-law purposes is punitive damages. The states of the veterans' domicile do not have an interest in whether or not punitive damages are imposed on the defendants. The legitimate interests of those states are limited to assuring that the plaintiffs are adequately compensated for their injuries and that the proceeds of any award are distributed to the appropriate beneficiaries. *See, e.g., In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979,* 644 F.2d 594, 612–613 (7th Cir.1981); *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967); *Hurtado v. Superior Court,* 11 Cal.3d 574, 584, 114 Cal.Rptr. 106, 112, 522 P.2d 666, 672 (1974). The only jurisdictions concerned with punitive damages are those, including the federal government, with whom the defendants have contacts signifi-

cant for choice of law purposes. Those contacts include defendants' place of incorporation, principal place of business, location of the plants that manufactured Agent Orange, and the site of any action taken in furtherance of what plaintiffs refer to as "the conspiracy of silence."

The purposes underlying the allowance of punitive damages are punishment of the defendant and deterrence of future wrongdoing. The purpose underlying the disallowance is protection of defendants from excessive financial liability. *See, e.g., Chicago Air Crash Disaster,* 644 F.2d at 613; *Forty-Eight Insulations, Inc. v. Johns-Manville Products,* 472 F.Supp. 385 (N.D. Ill.1979); *Pancotto v. Sociedada de Safaris de Mocambique, S.A.R.I.,* 422 F.Supp. 405 (N.D.Ill.1976).

■ Courts disagree as to whether, as between the place of misconduct and the primary place of business, the former or the latter has the greater interest in awarding punitive damages. *Compare Jackson v. K.L.M.,* 459 F.Supp. 953 (S.D.N.Y.1978) *with Chicago Air Crash Disaster,* 614 F.2d at 614–15. It is not necessary to decide that question for purposes of this litigation. The same reasons that justified the application of a single federal law or national consensus law to the government contract defense and to the standard of liability in this product liability case apply to the question of punitive damages. There is no rational method by which a state court could choose the law of any one state to govern the issue. The allegedly wrongful activity has contacts significant for choice of law purposes with at least twelve different jurisdictions. The Agent Orange was manufactured in many states by companies having their principal places of business in many other states, and the meetings and conferences which furthered the alleged "conspiracy of silence" took place in a variety of states.

On the other hand, there is an overriding federal interest in the award of punitive damages. The federal government is interested in the defense contractors' continued willingness and ability to supply material vitally needed for the national defense. The government also has an interest in assuring that defective war material does not injure American soldiers. How the balance should be struck in this case need not be decided now. It is enough to recognize that the federal government's interest parallels its interest in the defendants as war contractors, outlined above, and is demonstrably greater and more specific than the interest of any individual state.

### B. *Governmental Interest*

■ Under the governmental interest approach, the court must consider whether the public policy of a particular legislature would be furthered, frustrated or is irrelevant if applied in the case at bar. The law of the forum will be displaced only if the policy of the legislature of another forum has a stronger interest. *See generally* Currie, Notes on Methods and Objectives in the Conflict of Laws, 1959 Duke L.J. 171; Sedler, The Governmental Interest Approach to Choice of Law, An Analysis and a Reformulation, 25 U.C.L.A.L.Rev. 181 (1977). What was said above in connection with the discussion of the Restatement approach applies to an analysis of the application of the governmental interest analysis. It makes no difference whether this litigation poses a false conflict or a true conflict. There is no rational method by which a state could choose one state's law to govern some or all of the issues in the case and a state would look to a single national common law. Furthermore, as noted above, "the legislature of another forum," in this case the United States, has a far stronger interest than the legislature of any other forum. And, as demonstrated in Part I, C, supra, many states recognize the need for special treatment of Agent Orange plaintiffs.

### C. *Leflar—Better Law*

The Leflar approach requires that a court take into account "five choice-influencing considerations" and weigh each consideration in the light of the specific facts, with no more intrinsic importance attached

to any consideration than to another. *See generally* R. Leflar, American Conflicts Law, § 96 (3d ed. 1977); Leflar, Choice-Influencing Consideration in Conflicts Law, 41 N.Y.U.L.Rev. 267, 269 (1966). Those five considerations include predictability of legal result, maintenance of interstate order, simplification of the judicial task, the forum's governmental interests and a preference for application of the better law. The only relevant consideration which has not thus far been discussed is the fifth, a preference for application of the better rule of law. This last factor calls into play the notion of the national law as the "more progressive" law and possibly provides further support for the application of federal common law. But *cf.*, criticizing lack of predicability, Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 772, 811 ff., 965 ff., 958–960 (1983); Rosenberg, The Comeback of Choice-of-Law Rules, 81 Colum.L.Rev. 946, 948 (1981).

### D. *Traditional Approaches*

As with the states using the Restatement, governmental interests, and Leflar approaches, states using traditional approaches such as lex loci have never been faced with a case involving the number and quality of different state contacts presented by this litigation. Any conclusion, therefore, as to what such a state would do must, of necessity, be somewhat hypothetical. Nevertheless, we can reasonably conclude that the lex loci states would apply a federal or national consensus common law. As Professor Korn points out, even when "the lex loci delicti remains the general rule in tort cases [it may be] displaced ... in extraordinary cases." Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 772, 957 (1983).

Under the Restatement (First) of Conflicts, which embodies the lex loci approach, the general rule is that the law to be applied is the law of "the place of the wrong," Restatement (First) § 377. The "place of the wrong," in turn, is defined in personal injury cases to be "the place where the harmful force takes effect upon the body". *Id.* Note 1. In this case that would be South Vietnam, Laos or Cambodia as to the members of the Armed Forces and a variety of states and countries as to spouses and children. Although many of the more serious symptoms did not manifest themselves until years later, apparently the "harmful force [took] effect upon the body" of each affected servicemen immediately. Therefore, the exception of § 377 Note 2, which states that "when a person causes another voluntarily to take a deleterious substance ... the place of the wrong is where the deleterious substance takes effect and not where it is administered," does not call for a different result so far as servicemen are concerned. So far as wives or children are concerned, the place of coitus, if that could be determined, would probably be decisive.

Although the lex loci approach would normally look to South Vietnam, Laos, or Cambodia as the place of the wrong to the servicepeople, none of the parties have argued that the laws of those countries should be applied, even if their contents could be known. The theory behind lex loci is that "[e]ach state has legislative jurisdiction [*i.e.*, power] to determine the legal effect of facts done or events caused within its territory." § 377 Comment a. That rationale does not apply here: the jurisdiction where most of the use of herbicides took place, South Vietnam, no longer exists and Cambodia appears to be an independent state in name only now taken over by Vietnam. North Vietnam, the jurisdiction that has replaced South Vietnam and Cambodia, was at war with the United States and it was in the prosecution of the war that the exposure to Agent Orange took place. It would be ludicrous to allow North Vietnam (or France or the Soviet Union, whose laws undoubtedly have a strong influence on Vietnamese jurisprudence) to determine the law of this case.

Even if it is argued that the alleged adverse effects of exposure to Agent Orange did not manifest themselves until after the veterans returned from Vietnam and thus the normally applicable Restatement (First) rule is that the law of the state

where those first manifestations occurred would apply, it is still probable that a state court would apply federal or national consensus law to all substantive issues in the litigation. The fact that a state uses the lex loci approach in most cases does not mean that it is immune to arguments based on the relative interests of jurisdictions. Thus, for example, a number of states that generally apply the *lex loci* approach in tort cases will apply the law of the parties' domicile to the issue of spousal immunity on the theory that "the domiciliary's overwhelming interest in the spousal relationship requires deference to its law in determining the applicability of spousal immunities." *Tucker v. Norfolk & W.R. Co.*, 403 F.Supp. 1372, 1373 (E.D.Mich.1975), *quoted with approval in Sweeney v. Sweeney*, 402 Mich. 234, 262 N.W.2d 625, 628 (1978). *See also Williams v. Williams*, 369 A.2d 669 (Del.1976) (parental immunity), N.C.Gen. Stat. § 52–5.1 (1967) (interpersonal immunity).

Pragmatic application of lex loci is particularly likely here where the jurisdiction with the greater interest is the federal government. As already pointed out, states have long looked to federal law for the rule of decision in particular cases even though it was not mandated by the Supremacy Clause.

The rationale given by state courts for adhering to the lex loci aproach does not apply here. As the Supreme Court of Virginia stated in refusing to abandon the lex *loci* approach, "the components of the [modern approaches] can be viewed differently from case to case, thereby creating uncertainty and confusion in the application of the theory .... Thus, we do not think that the uniformity, predictability, and ease of application of the [lex loci] rule should be abandoned in exchange for a concept which is so susceptible to inconstancy ..." *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662, 664 (1979). When the choice is between forum law and a federal or national consensus law as distinguished from a choice between forum law and a sister state's law, that danger of "inconstancy" does not exist. For close to two hundred

years, state courts have had to choose between federal and state law in a particular case based not on lex loci, but on the relative interests of the state and federal governments in the case. Most of the decisions to apply federal law were made because the court viewed the application as mandated by the Supremacy Clause. Nonetheless, the same factors that decide whether federal law controls under the Supremacy Clause suggest whether it or national consensus law should control as a matter of choice of law. Finally, the *sui generis* nature of this litigation means that application of federal or national consensus common law to this litigation would not require a wholesale abandonment of lex loci in exchange for "a concept which is so susceptible to inconstancy."

### E. *Forum*

The decision to apply a national law is further reinforced by an analysis of what a court does when its choice of law rules point to foreign law and that law is not pleaded or proved by the parties. In such cases, a court will generally apply forum law or dismiss the case. Alexander, The Application and Avoidance of Foreign Law in the Law of Conflicts, 70 Nw.U.L.Rev. 602 (1975). As will be seen, the various reasons given for application of forum law or dismissal do not apply here; rather, the relevant decisions of the various states indicate that they would look to federal or national consensus law.

Clearly, dismissal is not warranted by the failure to plead and prove the content of foreign law. *See, e.g.*, the widely criticized *Walton v. Arabian American Oil Co.*, 233 F.2d 541 (2d Cir.1956) (dismissed for plaintiff's failure to prove content of Saudi Arabian law), discussed in, *e.g.*, E.F. Scoles & P. Hay, Conflict of Laws, 412–13 (1982); W.L.M. Reese & M. Rosenberg, Conflict of Laws, 384–91 (7th ed. 1978).

If a court does not dismiss a case for failure to prove foreign law, it will often apply forum law. Two rationales are given

for this. The first is that the court will presume that the foreign law is identical to the forum's law. *See, e.g., Louknitsky v. Louknitsky,* 123 Cal.App.2d 406, 266 P.2d 910 (1954) (presumption that Chinese marital property law is identical to California law). Other courts eschew presumptions and apply the law of the forum because no one has shown why it ought to be displaced. As *Leary v. Gledhill,* 8 N.J. 260, 84 A.2d 725 (1951), stated the matter: "the parties by failing to prove the law of France have acquiesced" in the law of the forum.

Neither rationale is applicable here. There is no reason to apply foreign law and therefore no reason to presume that foreign law is identical to forum law. As to the latter approach, it has been clearly shown in this litigation why the law of the forum should be displaced in the face of the overwhelmingly national and federal aspects of the case. A state court in such a position, having no preexisting applicable conflicts rule, would turn to federal or national consensus law.

It has been suggested that a state court, no matter what choice of law methodology it uses, faced with a case involving the extensive federal interests and multiplicity of state contacts, would apply forum law out of lack of any rational alternative. There is no need to fall back on this alternative of desperation. *Cf.* criticism of choice-of-law predicated primarily upon the choice of forum in Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 772, 959 *and passim* (1983). First, state law has not considered the complex question of a war contractor's liability to soldiers injured by toxic chemicals subject to federal regulation while engaged in combat and serving abroad. Second, a state with only a tangential connection to the litigation which has the choice of applying a far more relevant federal or national consensus common law will not apply a body of law to a case merely because the law happens to be that of the forum. *Cf. Henry v. Richardson-Merrell, Inc.,* 508 F.2d 28 (3d Cir.1975) (refusing under *Klaxon* to apply New Jersey's strict product liability law

because of the lack of that state's connection to the case); *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 305 A.2d 412 (1973).

## F. *von Mehren—Reconciling Conflicts*

The increasing incidence of conflicts of law problems result in large measure from the fact that the social, economic and technical worlds we live in far exceed in geographic scope the legal jurisdictions which establish and enforce controlling law.

One method of solving the conflict is for the forum state to create appropriate substantive law recognizing the policies of the various jurisdictions having an interest in the dispute. As von Mehren put it:

> The clash of values or policies that has arisen within the *ad hoc* community of concerned states is to be resolved not by considering what value or policy of the forum can be advanced but rather by determining how the forum would, in general, resolve the clash in question. The most obvious and general basis for making this determination is reasoning by analogy from the results reached in wholly domestic situations involving comparable clashes. Multistate situations involving true conflicts would thus present, just as do analogous domestic situations, the problem of deciding which among conflicting policies are, in general, to be preferred.

von Mehren, Choice of Law and the Problem of Justice, 41 Law and Contemporary Problems 34 (Spring 1977) (*footnote omitted*).

In most cases the choice of one jurisdiction's domestic law would suffice. But in some instances a molding of the conflicting substantive laws to achieve a viable alternative compromise acceptable to the larger overarching community would be sensible and just. One approach is that of compromise.

> The suggestion is that, in those cases, the values held by each concerned state should be compromised....

> If a unitary source is not posited, compromises—designed to take competing

views and policies into account and to advance harmony within a multistate order—can hardly be viewed as necessarily or inherently unjust. On the contrary, compromise as a principle of justice becomes understandable and attractive.

*Id.* at 38–39. And when the legislature does not act to make the necessary compromises, the courts must. *Id.* at 39.

Most of the examples given by von Mehren involve two party cases that recur over and over again as a result of the use of our multistate road systems. How much more apt is the approach he posits where tens of thousands are involved in what is alleged to be a single and unique national disaster with repercussions in scores of jurisdictions.

There is much logical merit and conceptual appeal in von Mehren's suggestion of individually crafted compromise statements of substantive law to meet the choice of law problems where the domestic substantive law of none of the states having contacts with the parties and their disputes should control. In run-of-the-mill conflicts situations this approach would lead to excessive lack of predictability and cost. The burden on the system would be greater than the benefits in most cases since lawyers and judges would spend too much time on customizing the law in individual cases and there would undoubtedly be increased appeals and reversals when trial and appellate court judgments on what was sound in the particular case diverged. *Cf.* J. Frank, American Law: The Case for Radical Reform 95–105 (1969) (criticizing "the creation of new decision points in the law of conflicts"). Nevertheless there are special cases with unique circumstances not likely to recur in the future where von Mehren's approach suggests the only sound method. Such a situation is now presented.

The overwhelming need for a uniform approach and a single substantive standard is obvious. Normally we would expect Congress to recognize this and provide a federal statute which would be all encompassing or which would leave lacunae to be filled by the federal courts directly or through absorbtion of state law. Although it could do so under its commerce or war powers, Congress has not enacted such a statute.

Given a failure of the legislature and the executive, the federal courts could be expected to step in by creating federal common law to cover a national problem. But the Second Circuit has blocked that route by denying that federal substantive law controls of its own force. *In re "Agent Orange" Product Liability Litigation*, 635 F.2d 987 (2d Cir.1980), *cert. denied sub nom. Chapman v. Dow*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). Thus, under *Klaxon*, we look to the states to accomplish the sound result. As a federal court we sit as a surrogate for the state courts, attempting to predict how pragmatic and wise state judges would address the problem.

It is entirely reasonable to assume that the state courts would recognize the strong national interest in a uniform national rule. A considerable number of states have already recognized the unique nature of the *Agent Orange* litigation problem. Given the strong state-federal interest in uniformity, the lack of a federal statute or of a uniform state statute, and the Second Circuit opinion denying that federal common law controls of its own force all substantive issues in *Agent Orange,* what would state courts do? Would they not look to the first court that dealt with the issue or to a neutral body to formulate the uniform rules they could all accept for this unique litigation? And is not a federal court charged with adjudicating all or nearly all the *Agent Orange* cases such a body? Professor von Mehren's analysis suggests that the answer to each of these questions is yes.

Once it is conceded, as we think it must be, that each of the jurisdictions involved would appreciate the overwhelming need for uniformity, to what single state's law could any state look to as controlling? Given the plethora of states and nations with contracts and the impossibility without a

full trial of even knowing where the allegedly offending dioxin was produced, it becomes apparent that no acceptable test can point to any single state. Thus, the law is driven in this most unusual case to either federal or national consensus substantive law as the only workable approach.

### G. *National Consensus Restated*

At most, a state's contacts in an "Agent Orange" suit would consist of the individual plaintiff veteran's residence in that state—a factor readily subject to change in our transient society—and the fact that one of the seven defendant companies is either incorporated, has its principal place of business or manufactured its Agent Orange in that state. At the risk of restating the obvious, those contacts are dwarfed by the national contacts in the case. The only jurisdiction with which all elements in the litigation undoubtedly have significant contacts, and the only unifying factor, is the nation. But for the fact that arguably the federal government has not allowed itself to be sued, federal law might apply under *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *see In re "Agent Orange" Product Liability Litigation*, 635 F.2d 987, 993 (2d Cir. 1980), *cert. denied sub nom. Chapman v. Dow*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

The application of a federal or national consensus common law to all substantive issues is consistent with the relevant decisions of the state courts and the federal courts sitting as state courts under *Erie* and *Klaxon*. Although the national and international contacts and interests present in this case are far greater, in both quantity and quality, than that of any heretofore decided, a number of state and federal courts have had occasion to deal with choice of law issues in mass tort situations where the interests of dozens of jurisdictions, including the United States, have been implicated.

In the litigation most closely analogous to Agent Orange for present purposes, the federal court for the District of Columbia, sitting in a diversity case as a local District of Columbia court, had to decide the law applicable to claims arising out of the crash near Saigon of an Air Force C–5A carrying United States military and civilian personnel and 226 Vietnamese orphans. *In re Air Crash Disaster Near Saigon, South Vietnam on April 4, 1975*, 476 F.Supp. 521 (D.D.C.1979). The specific issue before the court related to the survival of decedents' causes of action. It noted that the District of Columbia follows the "interest analysis" methods in choice-of-law. It analyzed the relevant interests as follows:

> The United States government (as distinguished from any state of the United States) carried on [the Vietnam] war and ended it for national foreign policy and military purposes. The transportation of the orphans on a United States Air Force C–5A, built by Lockheed, was incident to carrying out those foreign and military policies. If the death and injury suffered by these orphans in the dying days of the Vietnam war was caused by the negligence of the United States or of Lockheed, which built the plane expressly for the United States and to its specifications, that is a matter of far greater interest and concern to the United States than to any State of the United States. It is a "paramount" interest and concern of the United States federal government that its courts provide a just and reasonable resolution of claims such as those on behalf of the estates of the deceased orphans. *Compare United States v. California*, 332 U.S. 19, 40, 67 S.Ct. 1658 [1669], 91 L.Ed. 1889 (1947).

476 F.Supp. at 526–27. It applied District of Columbia law of survival to all parties despite the fact that plaintiffs resided all over the United States, and that Lockheed Aircraft Corp., a defendant with the United States, had its chief place of business and place of incorporation outside the District. District of Columbia law was really only a euphemism for a national substantive law of liability. Rejecting traditional conflicts of law, the court relied upon the *sui generis* nature of the case. *Id.* at 526.

With only slight paraphrasing, all that was said by the District of Columbia court applies with even greater force to this litigation: "the United States government (as distinct from any state of the United States) carried on [the Vietnam] war ... for national foreign policy and military purposes." The exposure of veterans to Agent Orange manufactured by the defendants "was incident to carrying out those foreign and military policies. If the ... injury suffered by" the veterans "was caused by the negligence of the" defense contractors who manufactured Agent Orange "expressly for the United States and to its specifications, that is a matter of far greater concern to the United States than to any State of the United States." The court concluded that "[b]ecause of the national interests at stake here, the law of the forum, which is the law enacted by Congress for the Seat of the Government should [not] be displaced." *Id.* at 529.

*In re Paris Air Crash of March 3, 1974,* 399 F.Supp. 732 (C.D.Cal.1975), also dealt with claims arising out of an air disaster occurring in a foreign country—the crash of a Turkish Air Lines DC–10 in France. The specific issue before the court was what law to apply in determining damages, liability having been conceded. Claimants were from 26 foreign countries and at least twelve states of the United States, a total of 38 jurisdictions. The court considered at length the interests of the United States. *Id.* at 745–47. It gave special weight to the fact that the DC–10 which crashed was "designed, constructed, manufactured, and tested in California," *id.* at 746, and that "the state of residence of designers and manufacturers has a most significant interest in applying its measure of damages to a product distributed throughout the world for the sake of uniformity of decisions involving such designers and manufacturers." *Id.* at 745. Therefore, the court concluded, "[c]learly the United States and the State of California both have governmental interests in applying the law of California, a state of the United States, in the measure of damages for each claimant, which interests are significantly greater

than the interests of countries or states of which either the decedents or claimants are citizens." *Id.* at 747.

An analysis of the rationale of both of the above decisions leads to the conclusion that a state using either "modern" or traditional choice of law methodology would apply federal or national consensus law to this litigation. The federal and national interests in this litigation are far greater than those implicated in either the *Saigon* or *Paris* cases. On the other side of the balance there is no single contact in this case equivalent to the contact of the place of manufacture and design as in *Paris.* A state court would therefore have no rational choice but to apply federal or national consensus common law.

Defendants cite a number of state and federal cases which have applied state law to the government contract defense and to suits by servicemen against defense contractors. *See, e.g., Brown v. Caterpillar Tractor Co.,* 696 F.2d 246 (3d Cir.1982); *Challoner v. Day and Zimmerman, Inc.,* 512 F.2d 77 (5th Cir.), *rev'd on other grounds,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Sanner v. Ford Motor Co.* (Super.Ct.Law Div.1976), 144 N.J.Super. 1, 364 A.2d 43, *aff'd,* 154 N.J.Super. 407, 381 A.2d 805 (1977), *cert. denied,* 75 N.J. 616, 384 A.2d 846 (1978); *Casabianca v. Casabianca,* 104 Misc.2d 348, 428 N.Y. S.2d 400 (Sup.Ct.1980); *Whitaker v. Harvell-Kilgore Corp.,* 418 F.2d 1010 (5th Cir. 1969).

These cases applying specific state law are inapplicable. Two of the suits, *Sanner* and *Casabianca,* were brought by veterans injured by nonmilitary products being used by civilians many years after their manufacture. *Challoner, Whitaker* and *Brown* were suits by individual soldiers and dealt with claims of manufacturing defects in airplanes and explosives, objects whose misuse is frequently regulated by state tort law. Apparently none of the parties in those cases urged that federal or national common law be applied and there was a logical basis for choosing the law of one particular state. Thus, for example, in

*Whittaker*, a suit arising out of the explosion of a hand grenade used by an enlisted man in basic training, the court applied Georgia law where the plaintiff serviceman was a citizen of Georgia, suffered his injury in Georgia, and the Georgia Uniform Commercial Code indicated that Georgia law should apply. 418 F.2d at 1016.

By contrast, plaintiffs in this litigation are probably from all fifty states, the District of Columbia, Puerto Rico and other areas controlled by the government, and at least two foreign countries, the exposure occurred in Vietnam and other countries, transactions and acts bearing a significant relationship to this case occurred in dozens of different states and at least three countries—the United States, South Vietnam and Canada—and defendants are incorporated and do business in many different states.

Because of the *sui generis* nature of this litigation, it is not surprising that there are no cases directly on point. It is, however, common to find state courts and federal courts sitting as state courts under *Erie* applying federal law, because of the predominant federal interest in the litigation. *See, e.g., Filardo v. Foley Bros.*, 297 N.Y. 217, 78 N.E.2d 480, 79 N.Y.S.2d 217 (1948), *rev'd on other grounds*, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949); *Weinberger v. New York Stock Exchange*, 335 F.Supp. 139, 143 (S.D.N.Y.1971); *McLaughlin v. Sikorsky Aircraft*, 148 Cal.App.3d 203, 195 Cal.Rptr. 764 (1983). Thus, state courts will often look to federal law if they feel it is appropriate.

That neither New York nor, as far as we have ascertained, any state has had a case such as this one before us does not permit our throwing up our hands and refusing to decide the question. Perhaps it would have been better if certification rules permitted posing the conflicts question to the more than half-a-hundred jurisdictions involved. But no such procedure is presently in place. *See, e.g.,* C. Wright, Law of Federal Courts, 313–315 (4th ed. 1983); Meyer, Justice, Bureaucracy, Structure and Simplification, 42 Maryland L.Rev. 659, 673–74 (1983). In the meantime, this court must ascertain the living state law as best it can. The "evolutionary growth" of the law of conflicts means that each "litigant, whether in the federal or the state courts, has a right that his case shall be a part of this evolution—a live cell in the tree of justice...." Corbin, The Laws of the Several States, 50 Yale L.J. 762, 776 (1941). *See also Essex Universal Corp. v. Yates*, 305 F.2d 572, 580–82 (2d Cir.1962) (Friendly, J. concurring); Hart & Wechsler's The Federal Courts and the Federal System, 708–710 (2d ed. by P.M. Bator, D.L. Shapiro, P.J. Mishkin & H. Wechsler, 1973); C. Wright, Law of Federal Courts, 370–377 (4th ed. 1983).

### IV. *Statutes of Limitation*

Statutes of limitations present special choice of law problems. Each state has developed precise and complex statutory criteria. The parties have been asked to brief this issue. A decision on the application of statutes of limitations and the effect of the rules respecting conflicts of laws awaits receipt of those briefs.

### V. *Conclusion*

For the reasons noted, it is likely that each of the states would look to a federal or a national consensus law of manufacturer's liability, government contract defense and punitive damages. What is the nature of the national consensus or federal law is a subject for another memorandum.

We emphasize that this memorandum is a first general guide to the parties of the court's present thinking. It is subject to refinement and change as the legal issues, facts, and applicable law become clearer during the course of the pretrial and trial proceedings.